Thomas CREMER, Plaintiff–Respondent,

v.

MISSOURI PACIFIC RAILROAD
COMPANY, Defendant–
Appellant.

No. 58429.

Missouri Court of Appeals,
Eastern District,
Division Two.

June 4, 1991.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 3, 1991.

**24**

Kim Roger Luther, Katherine L. Butler, St. Louis, for defendant-appellant.

Thomas C. Hullverson, St. Louis, Thomas Graham, Jefferson City, Stephen H. Ringkamp, St. Louis, for plaintiff-respondent.

GARY M. GAERTNER, Presiding Judge.

Appellant, Missouri Pacific Railroad Company, appeals from a jury verdict of 2.6 million dollars on respondent's, Thomas Cremer's, action for damages pursuant to F.E.L.A., 45 U.S.C. § 51 et seq. The jury found that respondent was fifty percent at fault in the incident, therefore, the jury's verdict netted respondent 1.3 million dollars. While the evidence to support the jury's award is not questioned, we will briefly recite the facts of the case before addressing appellant's claims of error.

On July 6, 1987, respondent, a railroad conductor for appellant, was assigned to move a train from Jefferson City, Missouri to Kansas City, Missouri. The train consisted, inter alia, of seven empty railroad cars which were to be dropped off in Lee's Summit, Missouri. At Lee's Summit, respondent was to pick up an additional thirty-one empty cars which were to be taken to Kansas City.

Upon arriving in Lee's Summit, respondent unhitched the four engine cars from the rest of the train and picked up the thirty-one empty railroad cars which he was to transport to Kansas City. Respondent then connected the engines and thirty-one empties to the rest of the train. The train then consisted of four engine cars, thirty-one empties, thirty-four loaded cars and the seven empties which needed to be dropped off.

In order to drop off the seven empty cars, which were at the rear of the train, the train had to be backed.[1] The train's engineers operated the locomotive engines while respondent rode on the back of the last car to make sure that the train's path was clear.

As the train was shoved, seven of the block of thirty-one empty cars derailed causing the train to stop suddenly. The sudden stop flung respondent to the ground. Respondent suffered injuries to his neck, back and arms. Respondent is no longer able to perform manual labor and will eventually require surgery to his back.

The trial commenced on Monday, January 22, 1990, and did not end until Thursday, February 1, 1990. The jury found appellant and respondent equally at fault and assessed respondent's total damages at 2.6 million dollars.

Appellant's first point on appeal is that the court erred in admitting expert testimony which was beyond the scope of the expert's endorsement and which was not revealed during the expert's deposition. Appellant claims that the court should have granted appellant a continuance so that it could obtain rebuttal testimony. Appellant's point cannot be sustained.

█ Respondent endorsed Michael Massie as an expert to testify regarding the negligence of appellant and the safety and condition of the track and the ground in the vicinity of the derailment. Respondent's theory of negligence, as supported by Mr. Massie, was that the appellant failed to maintain the rail bed in a safe manner by allowing water and mud to weaken the area where the cars derailed. Respondent also claimed that appellant negligently arranged the railroad cars which required respondent, as conductor, to perform a shove in order to drop off the seven empty cars.

During respondent's own testimony, it was established that a shove involving a large number of railroad cars was more dangerous than a shove which involved a smaller number. Respondent stated that the larger number of cars causes streets to be blocked for a longer period of time and interferes with radio communications with the central dispatch in Kansas City.

---

1. The technical term for such a maneuver is a "shove." Hereinafter, we will refer to the re- verse movement of a train as a shove.

Respondent, during direct examination of Mr. Massie, asked Mr. Massie whether he had ever been involved in shoves of trains of this length, seventy-two cars (seventy-six, including the four locomotive engines). Appellant objected claiming that such testimony by this expert would constitute a surprise and, therefore, appellant was entitled to a continuance. The court took appellant's word for the fact that Mr. Massie did not discuss the subject of whether shoves of this length were dangerous and allowed appellant to voir dire Mr. Massie outside the presence of the jury. The court did not grant a continuance.

The record belies appellant's claim. During Mr. Massie's deposition, appellant questioned him quite extensively regarding every aspect of his testimony including the safety of performing a shove with a large number of railroad cars. Representative of Mr. Massie's deposition testimony on the subject is the following:

Q. (Appellant's attorney): So the longer the train, the heavier the train, the more lateral drawbar force that would be exerted?

A. (Mr. Massie): I think that would be directly proportional, yes.

Q. Is that a dangerous shove?

A. Shoving ninety-five cars?

Q. In your opinion.

A. It shouldn't be. It shouldn't be done on a daily basis. Depends on the position of the cars, naturally, could increase problems, and what we have discussed earlier, the condition of the track and the grade, terrain, curvature in the track. All of that has to do with increasing the problem.

\*　\*　\*　\*　\*　\*

A. (Mr. Massie): Is it safer to shove twenty than fifty?

(Appellant's attorney): Yes.

A. I guess it would depend on the makeup and type of cars and a lot of other criteria, like the area that you're in.

Q. (By Mr. Luther): On a completely flat stretch of track, is it safer to shove twenty cars as opposed to fifty cars?

\*　\*　\*　\*　\*　\*

A. Same type of cars, I don't see any problems in shoving those, but either way, as long as proper techniques are used. The likelihood of derailment occurring might be greater with additional cars, just on the ratio increasing.

The above testimony is strikingly similar to the testimony which Mr. Massie offered during the trial:

Q. (Respondent's attorney): All right. And do you have an opinion as to whether such a long shove, in and of itself, is an unsafe move?

A. (Mr. Massie): In my opinion is that it is not unsafe, no.

Q. How would you characterize it?

A. Well, the more cars you put on, the more cars you are shoving, the safety factor may come into play. It may be less safe with more cars, but taking into consideration the grade, the engineer's training and techniques and the signals given, it can and is done every day very safe.

We fail to see how appellant could have been surprised by Mr. Massie's testimony regarding the safety of performing a shove with a large number of rail cars. As the trial court aptly stated, "this has always been an issue in this case."

■ Even assuming that appellant was correct in asserting that Mr. Massie's testimony was beyond his endorsement and deposition testimony, appellant's argument would fail. The trial court is granted broad discretion in fashioning a remedy for the failure of a party to properly disclose the opinions of its experts or the factual basis for reaching their conclusions. *Gassen v. Woy*, 785 S.W.2d 601, 604 (Mo.App., W.D.1990); *Stallings v. Washington University*, 794 S.W.2d 264, 273 (Mo.App., E.D.1990). As was approved in *Woy*, the trial court in our case permitted the appellant to voir dire Mr. Massie outside the presence of the jury and prior to his trial testimony.

It was not an abuse of the court's discretion either to allow the evidence to be presented or to deny appellant a continuance. Point denied.

Appellant's second and final point on appeal concerns the admission of alleged hearsay testimony by respondent and the respondent's testimony regarding a prior incident for which he was temporarily fired.

■ During cross-examination, respondent was asked why he did not respond to any of the attempts by Missouri Pacific to involve him in vocational rehabilitation or to become a candidate for two jobs with Missouri Pacific which respondent may have been able to handle. Respondent replied that he felt he could not trust the railroad anymore.

On redirect, respondent's attorney, over vigorous objection by appellant, asked respondent why he did not trust Missouri Pacific any longer. Respondent's testimony in this regard consisted of the following:

A (Respondent) My reasons are that other persons that have returned to work after they have been injured have been harassed.

Q (Respondent's attorney) How do you mean that?

A I had a brakeman that was working for me—with me, and this particular person was harassed on this one night.

Q And is he still with the railroad?

A No, sir. He was fired.

Q Had he had a claim or a law suit against the railroad?

A He had, yes, sir.

*       *       *       *       *       *

Q All right. did you—who is this person that you say was harassed?

A It was Mike Pascal.

Q How do you spell that?

A I believe it's—his last name is P–A–S–C–A–L.

Q What kind of a job did he have?

A He was a brakeman.

Q From what you could see and observe, was he able to handle the job?

A He was doing the best that he could.

Appellant claims that respondent's reference to Mr. Pascal constituted hearsay testimony which was offered for the purpose of confusing and inflaming the jury. Initially, we note that our understanding of hearsay requires an out of court *statement* offered to prove the truth of the matter asserted. Respondent's testimony appears to be based on his own personal observations regarding the disposition of Mr. Pascal subsequent to his returning to work from an injury. We fail to see that an out of court statement has been offered in evidence.

Appellant attempts to fit this case within the holding of *Williams v. Bailey*, 759 S.W.2d 394 (Mo.App., S.D.1988). In *Williams*, testimony was offered which showed that defendant had a good driving record prior to the accident which was the subject matter of the underlying negligence suit. The Southern District held that such character evidence was inadmissible since the danger was too great that the testimony would cause prejudice, confusion of the issues and surprise. *Williams*, 759 S.W.2d at 396. Appellant argues that respondent's testimony regarding Mr. Pascal was an attempt to assassinate the character of Missouri Pacific.

We find that respondent's testimony was merely an attempt to explain why he mistrusted Missouri Pacific; an explanation which appellant itself invited during cross-examination of respondent. While it can be debated whether respondent's reasons for distrust were warranted or not, the fact remains that the subject was broached by appellant. The court's allowing respondent to explain his distrust was not error.

■ Respondent also testified during his direct examination that the train which he operated was occupying a railroad track which intersected the main railroad line. A red signal at the intersection meant that the main line could not be crossed and this red signal was on as respondent approached the main line. In order to drop off the seven rail cars without crossing the main line, respondent found it necessary to perform the shove maneuver. Respondent was then asked whether he had any prior experience with entering a main line contrary to a red signal. Respondent replied in the following manner:

Q (Respondent's attorney) What happened to you as a member of that crew in a train that went through the signal?

A The whole train crew was fired on the spot, pulled out of service, so to speak.

Q All right. And was there a later reinstatement?

A Yes, sir.

Q All right. And were you charged in any way with any disciplinary action?

A No, sir.

Q Has that experience left any impression in your mind?

A Yes, sir.

Appellant claims that this testimony was collateral to the issues at trial and was offered only to confuse and inflame the jury. However, one of appellant's claims of comparative negligence of respondent was that respondent could have performed another maneuver, short of the shove that he decided to perform, without violating the main signal. Respondent's testimony regarding a prior incident in which he violated a signal was offered to explain why he was hesitant to take the chance of violating another signal.[2]

Respondent's testimony clearly was offered to refute the claim of negligence against him. That respondent was not attempting to impugn the character of appellant is most clearly noted by respondent's final question on the subject, as quoted above. Respondent sought to justify his own actions; not emphasize the actions of appellant. Point denied.

The verdict of the jury is affirmed in all respects.

CRIST and AHRENS, JJ., concur.

2. Respondent also indicated that, in this case, he was denied permission to enter the main line because a passenger train was heading toward the Lee's Summit railroad yard on the main track. If respondent's train had violated the main line, the passenger train may have been instructed to make an immediate, emergency stop, endangering its passengers.