**Jamie BAILEY, Plaintiff–Respondent,**

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Defendant–Appellant.**

No. 70194.

Missouri Court of Appeals,
Eastern District,
Division Four.

March 18, 1997.

Schoenbeck, Schoenbeck & Associates, Albert E. Schoenbeck & Robert L. Rodenbush, St. Louis, for defendant-appellant.

C. Marshall Friedman, P.C., C. Marshall Friedman, Daniel J. Cohen & Kenneth E. Rudd, St. Louis, for plaintiff-respondent.

KAROHL, Judge.

Former employer, Norfolk and Western Railway Company (N & W), appeals from: (1) a judgment granting former employee, Jamie Bailey (Bailey), $404,475 on his claim under the Federal Employers' Liability Act (FELA) 45 U.S.C. §§ 51–60, for damages for coronary artery disease and gastritis allegedly caused by N & W's negligence; and, (2) an order overruling its Motion for Judgment Notwithstanding the Verdict, or Remittitur, or in the Alternative, Motion for a New Trial.

## FACTS

Bailey worked as an "over-the-road" brakeman for N & W from 1962 until 1990. Bailey would ride on the train from one rail yard to another, and perform many tasks to keep the train running. One of his duties was to make repairs when necessary. The work of a brakeman is hard work.

Bailey was an on-call worker. He was subject to be called in, "24 hours a day, 7

days a week, 365 days out of the year." The on-call nature of his job resulted in a very erratic work schedule. He would sometimes work in the morning, other times in the evening and still other times in the middle of the night. It was very difficult to anticipate when he would be called for his next shift. He testified that as a result of his unpredictable work schedule, "I couldn't get rest. I didn't know when to go to sleep, or when to get up, I couldn't, I just couldn't get any rest."

Bailey's difficulty in getting adequate rest was exacerbated by the away-from-home sleeping dormitory provided by N & W at its North Kansas City yard. Other employees of N & W testified the dormitory was not a good place to get sleep. The dormitory was too noisy, the temperature too hot or too cold and the lighting too bright.

The walls of the dormitory were not well insulated against noise. The dormitory was less than 40 feet away from refueling tracks where engines were switched and cars banged. Also, the sound of trains traveling 25 miles an hour along the nearby mainline tracks could be heard within the dormitory. The yard received a lot of outside traffic. The noise of grocery and trash trucks would crash through the dormitory. The sounds of employees working in the yard with jack hammers and other maintenance equipment could be heard within the dormitory. One employee testified, "the sound went completely through the dormitory.... like you['re] walking down the street and walking by somebody with a jack hammer." Many noises coming from within the dormitory would also disrupt the sleep of employees including: a "tremendous banging noise" from the climate control system, knocks on doors for employees who were called back to work and scraping noises of beds being moved by cleaning personnel.

The lack of adequate climate control in the dormitory also disrupted employees' sleep. The manager of the dormitory testified, "[f]or a long time the thermostat control was kept locked up and we couldn't get [to] it to control it." The vent covers were regularly broken or missing. In the summer, the air conditioning ran constantly, cooling the rooms so much employees would have to open windows to warm the rooms, letting in all the outside noise. In the winter, the rooms near the boilers would have floor temperatures of up to 95.7° and the rooms further away would get so cold that on one occasion ice formed on an inside wall.

The lighting in the dormitory also disrupted sleep. It was difficult to create a dark sleeping environment when attempting to rest during daylight hours. According to Bailey, "half the rooms didn't have curtains."

N & W had notice that the dormitory was not conducive to sleep. The manager of the dormitory received several complaints about the sleeping conditions. She relayed these complaints to her supervisors.

The Railway Labor Executive Association (RLEA) represents railroad workers before Congress, the Interstate Commerce Commission and the Federal Railroad Administration (FRA). In 1974, RLEA filed a petition with FRA requesting sleeping facilities be moved away from the yards where railroad switching occurs because the noise prevented railroad workers from receiving adequate rest. In 1976, Congress amended the Hours of Service Act making it unlawful for a railroad to provided away-from-home employee lodging which does not provide a meaningful opportunity for rest free from interruptions caused by noise under the control of the railroad. *See* 45 U.S.C. § 62(a)(3) (1976).

N & W also had constructive notice that inadequate rest could cause health problems. One of N & W's experts agreed with the proposition that "shift work, shift variability and sleep deprivation over long periods of time endured chronically, may contribute to the formation of coronary artery disease." The same expert also conceded that information on the possible health consequences of inadequate rest has been available to the railroad industry for a long time.

Bailey was diagnosed with ulcers in 1982 or 1983. In June 1989, he was diagnosed with coronary artery disease. He underwent an angioplasty to open a blockage in excess of 90% on the right side of his heart. In April 1990, Bailey retired from N & W because of his heart and stomach conditions.

Since 1989, Bailey has been diagnosed with four other blockages in his heart and arteries.

At trial, four medical experts opined that Bailey's physical injuries were partially caused by his hours of work and his deprivation of sleep over his 28–year career. One doctor testified:

> the body has an internal clock, a very powerful clock, circadian clock which dictates the time of day in which you are maximally alert for sleeping.... So this biological clock, we've learned more recently, is the reason why shift workers have so much difficulty. The biological clock intends, if we can say it that way, for you to be awake during the day and at sleep at night. When that isn't the case, then there is physiological consequences.

He also identified two health consequences resulting from the disruption of the circadian clock: "The first is gastrointestinal disease, most prominent there is ulcers, stomach ulcers. The second is cardiovascular problems; angina, heart attacks, heart pains ..." and coronary artery occlusion. He concluded that Bailey's work schedule and dormitory sleeping environment provided to him during his 28–year career, contributed to the cause of his gastritis and his coronary artery disease.

## DISCUSSION

In its first point, N & W argues the trial court erred in overruling its motions for directed verdict because Bailey had failed to make a submissible case under FELA for heart disease and gastritis. It contends Bailey failed to make a submissible case because he failed to meet the United States Supreme Court's "zone of danger" test.

Section 1 of FELA provides that "[e]very common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51.

■ N & W argues the United States Supreme Court in *Consolidated Rail Corp. v.*

*Gottshall and Carlisle,* 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994), held that claims like Bailey's are not cognizable under FELA. N & W's argument appears to rely on one of two propositions; either: (1) *Gottshall/Carlisle's* "zone of danger" test limits recovery under FELA for *any* kind of injury, even purely physical ones, to employees "who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct." *Id.* at 547–548, 114 S.Ct. at 2406; or, (2) Bailey's claim is a work-related-stress claim and such claims, even if they involve purely physical injuries, are not cognizable because Bailey did not suffer his injuries while he was within the "zone of danger."

■ To the extent N & W's argument relies on the first proposition, it misstates the *Gottshall/Carlisle* decision. *Gottshall/Carlisle* does not stand for the proposition that only claims for injuries, physical or otherwise, that are caused by physical impact or the threat of imminent physical harm are cognizable under FELA. The issue in *Gottshall/Carlisle* was "the proper standard for evaluating claims for negligent infliction of emotional distress that are brought under the Federal Employers' Liability Act." *Id.* at 535, 114 S.Ct. at 2400. The Court held "that claims for damages for negligent infliction of emotional distress are cognizable under FELA." *Id.* at 550, 114 S.Ct. at 2407. However, it limited the scope of recovery for negligently inflicted emotional distress under FELA to emotional injuries, and related physical manifestations of the emotional injuries, caused by a physical impact or the threat of imminent physical harm. *Id.* at 554–558, 114 S.Ct. at 2410–2411. The Federal common law "zone of danger" test adopted by the *Gottshall/Carlisle* Court was designed to limit the scope of recovery for claims of negligent infliction of emotional distress under FELA, and not for all FELA claims.

N & W's argument also appears to rely on the proposition that Bailey's claim is a work-related-stress claim and such claims are not cognizable under FELA. N & W relies on dicta in *Gottshall/Carlisle* where the Court considered the claim of Alan Carlisle. Car-

lisle was a trainmaster for Consolidated Rail Corp. (Conrail). Reductions in staff required Carlisle to take on additional duties and work long and erratic hours. As a result Carlisle experienced insomnia, headaches, depression, weight loss and eventually a nervous break-down. Carlisle sued Conrail for negligent infliction of emotional distress under FELA. *Id.* at 538–540, 114 S.Ct. at 2402. The Su-preme Court held:

> Carlisle's work-stress-related claim plainly does not fall within the common law's con-ception of the *zone of danger, and* Carlisle makes no argument that it does. Without any support in the common law for such a claim, we will not take the radical step of reading FELA as *compensating for stress* arising in the ordinary course of employ-ment. In short, the core of Carlisle's com-plaint was that he "had been given too much—not too dangerous—work to do. That is not our idea of an FELA claim." *Lancaster* [*v. Norfolk and Western Rail-way Co.*], 773 F.2d [807], at 813 [ (7th Cir.1985) ].

*Id.* at 558, 114 S.Ct. at 2411–2412. (Our emphasis.)

N & W would extend this dicta to preclude claims for injuries, even physical ones, which are based on a stressful work schedule. Bai-ley argues this dicta should not be interpret-ed or construed in isolation. He argues in his brief:

> it is clear that the *Gottshall* Court's plain intendment in granting certiorari in the cases below was to resolve the issue re-garding the standard for cognizability of F.E.L.A. claims for negligent infliction of emotional distress.... When further con-sidering the factual context presented in the *Gottshall* and *Carlisle* cases, it is clear that the "stress" alleged by those plaintiffs was emotional distress.... With the fore-going in mind, it is simply absurd to pull the above-quoted *"work-related stress"* language from the *Gottshall* decision and attempt to construe it separate and apart

from the entire context of the case, which focuses on *emotional injury.*

There are cases which have interpreted *Gottshall/Carlisle* as precluding such work-related-stress claims involving heart dis-eases. *See Dennis v. Consolidated Rail Corp.*, 1994 WL 494453 (E.D.Pa.); *Capriotti v. Consolidated Rail Corp.*, 878 F.Supp. 429 (N.D.N.Y.1995); *Keith v. Consolidated Rail Corp.*, U.S.Dist.Ct., E.D. of Michigan, South-ern Division, No. 95–CV–70216 (June 18, 1996).[1]

Even Bailey's authority, *Walsh v. Consoli-dated Rail Corp.*, 937 F.Supp. 380 (E.D.Pa. 1996), acknowledges,

> [w]hile Gottshall purportedly limits the class of potential claimants of negligent infliction of emotional distress to those who actually fall within the relevant zone of danger, several courts have relied on this decision when refusing to recognize a cause of action under FELA to compen-sate for stress arising in the ordinary course of employment.

*Id.* at 388. The *Walsh* court held, "FELA does not provide relief for victims of routine, job related stress...." *Id.* at 389.

The plaintiff in *Walsh* filed a complaint against Conrail under FELA, alleging that the railroad's negligence caused him to suffer a stroke. *Id.* at 382. Walsh argued, "Con-rail inadequately staffed its operations, re-sulting in a more strenuous work schedule; contracted with physicians who failed to properly evaluate and treat his hypertension; and required him to perform work beyond his capacity and aggravated his hypertension, a known disability." *Id.* at 383.

The *Walsh* court first examined whether Walsh's injury was emotional or physical. It held, "Gottshall's instructional value lies largely in claims for negligent infliction of emotional distress which present the same emotional injuries (albeit with physical man-

---

1. Some of these cases interpret the *Gottshall/Car-lisle* dicta as addressing duties imposed by FELA suggesting that FELA does not impose a duty on employers to maintain a stress-free work envi-ronment, even if the stress causes purely physical injuries. Other cases interpret the dicta as ad-dressing the nature of injuries resulting from work-related-stress. These cases suggest that work-related-stress claims necessarily involve emotional injuries. The injuries are emotional, even if they involve physical manifestations, be-cause they are caused by *stress.*

ifestations) that Carlisle and Gottshall presented." *Id.* at 387. The court determined,

> Walsh presents a claim for negligent infliction of a *physical* injury completely distinct from the emotional and mental injuries addressed in Gottshall.... Walsh does not assert that Conrail's negligence caused a mental or emotional injury which then manifested itself through physical symptoms,.... Indeed, his case does not contain any "emotional" component: notably absent from Walsh's Complaint is any mention of emotional injury.

*Id.* at 387–388. (Our emphasis.)

Similarly here, Bailey's alleged injuries, heart disease and gastritis, were purely physical. His medical experts testified his heart disease and gastritis were, in part, caused by the inadequate sleeping facilities negligently maintained by N & W. They testified N & W's inadequate sleeping facilities caused Bailey's sleep deprivation and disrupted his "circadian rhythms", a physiological and not a mental or an emotional process, which ultimately caused his heart disease and gastritis.

The *Walsh* court found support for its decision to distinguish Walsh's claims from the emotional injuries discussed in *Gottshall/Carlisle* from the policy considerations discussed in that Supreme Court decision. The *Gottshall/Carlisle* Court noted several policy considerations supported its imposition of the "zone of danger" test for FELA claims of negligent infliction of emotional distress. It observed that many of these policy considerations were "based on the fundamental differences between emotional and physical injuries." *Gottshall/Carlisle,* 512 U.S. at 545, 114 S.Ct. at 2405. It also observed,

> [b]ecause [all of the causes] of emotional disturbance [are] usually not as readily apparent as that of a broken bone ... [the] recognition of a cause of action for [emotional] injury when not related to any physical trauma may inundate judicial resources with a flood of relatively trivial claims, many of which may be imagined or falsified, and that liability may be imposed for highly remote consequences of a negligent act.

*Id. citing Maloney v. Conroy,* 208 Conn. 392, 397–398, 545 A.2d 1059, 1061 (1988). The Court found the possibility of the absence of finite limits on the number of persons who might suffer emotional injury as a result of a given negligent act, particularly significant. *Id.* The *Walsh* court held that the Supreme Court's concerns were not relevant to this claim because of the certainty and predictability of the physical injury alleged. *Walsh,* 937 F.Supp. at 388.

We also review a case where the Supreme Court's concerns are inapplicable. Bailey's physical injuries were certain and predictable. Allowing Bailey's claim would not result in unlimited liability. Only a finite number of persons could pursue claims that an inadequate sleeping facility, negligently maintained by their employer, disrupted their circadian rhythms resulting in coronary artery disease and gastritis.

Bailey's coronary artery disease and gastritis are physical injuries. His claim is one for negligent infliction of a *physical* injury; not an emotional one. The portions of *Gottshall/Carlisle* which concern the proper scope of the availability of a claim for negligent infliction of emotional distress are inapplicable.

Some courts have relied on the *Gottshall/Carlisle* dicta to preclude all FELA work-related-stress claims. "In refusing to entertain claims which assert nothing more than job related stress, Gottshall and its progeny draw a distinction between FELA claims alleging that the railroad assigned 'too much' work and those alleging that the railroad assigned work that was 'too dangerous.' " *Walsh* 937 F.Supp. at 389.

In *Capriotti v. Consolidated Rail Corp.,* 878 F.Supp. 429 (N.D.N.Y.1995), the court refused to recognize a claim that alleged the cumulative effect of the employee's "duties and responsibilities and the long hours of work created a stressful environment which caused his injury." *Id.* at 433. The court held that kind of claim is identical to Carlisle's: " 'that he had be [sic] given too much—not too dangerous—work to do.' " *Id. citing Gottshall/Carlisle,* 512 U.S. at 558, 114 S.Ct. at 2412. The court noted that the employee had "not identified any particular

condition existing at Conrail that was dangerous." *Capriotti*, 878 F.Supp. at 433. Bailey did not allege or try a claim, based on stress as the cause of his physical injuries.

The *Walsh* court observed, in the cases after *Gottshall/Carlisle* that fell on the "too dangerous" side of the equation, the employees identified a particular, discrete condition of their employment that made their jobs "too dangerous." *Walsh*, 937 F.Supp. at 389. In *Walsh*, the particular and discrete condition that made his job "too dangerous" was the misdiagnosis and treatment of his hypertension. *Id.* Here, the particular and discrete condition that made Bailey's job "too dangerous" was the inadequately maintained sleeping facilities.

Bailey's claim is cognizable under FELA. The *Gottshall/Carlisle* Court's "zone of danger" test is not a prohibition because Bailey's claim is not for negligent infliction of emotional distress, nor is it merely a negligent failure to provide a stress-free work environment claim. His claim is for a failure to exercise reasonable care in providing a reasonably safe place to work and reasonable conditions in which to work where the railroad had notice of the hazardous conditions in the dormitory. Lodging accommodations provided by the railroad for its employees are work conditions. *See Empey v. Grand Trunk Western Railroad Co.*, 869 F.2d 293 (6th Cir.1989); *Carney v. Pittsburgh & Lake Erie Railroad Co.*, 316 F.2d 277 (3rd Cir. 1963); and *Mostyn v. Delaware, L. & W.R. Co.*, 160 F.2d 15 (2nd Cir.1947). The duty to provide reasonably safe conditions is a traditional and recognized one under FELA. *Walsh*, 937 F.Supp. at 390. Bailey presented evidence which supported findings that N & W breached its duty. He was an on-call employee who stayed overnight in an in-yard dormitory owned and inadequately maintained, by N & W.

> [W]here [the railroad] has breached ... [a] traditional and recognized dut[y], and a nexus exists between the breach and the resulting injury, a FELA claim exists so long as [the railroad's] breach played even a slight role in causing the physical injury. This remains true even if the stress of general working conditions acts in concert

with [the railroad's] breach and plays an intervening and contributory role, albeit a minor one, in producing the injury.

*Walsh*, 937 F.Supp. at 390. Point denied.

■ N & W also argues, in a subpoint, Bailey failed to make a submissible negligence claim under FELA. To establish a submissible case under FELA, the plaintiff must show that the railroad had a duty to provide him with a reasonably safe place to work, that the railroad breached its duty of care, that this lack of due care played some part, however slight, in producing the plaintiff's injury and that the injury was reasonably foreseeable. *White v. Union Pacific Railroad Company*, 871 S.W.2d 50, 53 (Mo. App.E.D.1993).

N & W argues Bailey failed to make a submissible case that: (1) his working conditions were unsafe; and, (2) the railroad could reasonably foresee that its alleged negligence would result in his coronary artery disease.

■ Bailey's evidence supported a finding of unsafe conditions in N & W's sleeping facilities. The dormitory was often too noisy, too hot or too cold and too bright. These conditions coupled with an erratic work schedule contributed to Bailey's severe sleep deprivation which disrupted his circadian rhythms, ultimately causing his coronary artery disease and gastritis. N & W had actual knowledge its dormitory was substandard. Bailey's evidence clearly supported a finding that his sleeping facilities were unsafe.

■ The issue of foreseeability is generally a jury question. *Stewart v. Alton and Southern Railway Company*, 849 S.W.2d 119, 125 (Mo.App.E.D.1993). Judicial review is limited to the reasonableness of the jury finding. *Id.* It is knowledge or anticipation of the possibility of harm to plaintiff, not of the exact nature of the injury, that is determinative. *Id.* N & W received several complaints detailing the poor conditions of the dormitory, it knew of the erratic hours Bailey worked, and it also knew of the hard labor required of brakemen. It was reasonably foreseeable that these working conditions would adversely affect periods of rest and sleep and could cause Bailey to suffer some kind of injury. Even one of N & W's experts

testified that "shift work, shift variability and sleep deprivation over long periods of time endured chronically, may contribute to the formation of coronary artery disease." The same expert also conceded that information on the possible health consequences of inadequate rest has been available to the railroad industry for a long time. Bailey presented sufficient evidence to support findings of defect, causation, a reasonably foreseeable result and physical injury. Subpoint denied.

■ N & W argues in another subpoint that *"PLAINTIFF FAILED TO MAKE A SUBMISSIBLE CASE UNDER THE FEDERAL EMPLOYERS' LIABILITY ACT ON DEFENDANT'S ALLEGED NEGLIGENCE IN PURPORTEDLY VIOLATING THE HOURS OF SERVICE ACT BECAUSE HE IS STILL BOUND BY THE PARAMETERS OF CARLISLE."*

The Hours of Service Act, 45 U.S.C. § 61 *et seq.* imposes many duties on railroads concerning limits on how many consecutive hours a railroad can schedule an employee for work and the quality of sleeping quarters for employees voluntarily provided by the railroad. Although there is no private right of action under the Hours of Service Act, *United Transportation Union v. Lewis,* 699 F.2d 1109 (11th Cir.1983), Bailey claims he is entitled to recover under FELA because N & W's violation of the Hours of Service Act amounts to negligence *per se.*

■ "It is well-settled that the FELA requires a finding of negligence per se when there has been a violation of a safety statute specifically aimed at the railroad industry." *Ries v. National R.R. Passenger Corp.,* 960 F.2d 1156, 1159 (3rd Cir.1992). "[T]he Safety Appliance, Boiler Inspection and Hours of Service Acts are all phrased in terms of "it shall be unlawful," which is the usual phrasing of a statute establishing negligence per se." *Id.* at 1164.

The court submitted Jury Instruction No. 13 based on Bailey's theory that N & W violated § 62(a)(3) of the Hours of Service Act. Section 62(a)(3) provides,

(a) **Limitations**

It shall be unlawful for any railroad, its officers or agents, subject to this chapter—

. . . .

(3) to provide sleeping quarters for employees (including crew quarters, camp or bunk cars, and trailers) which do not afford such employees an opportunity for rest, free from interruptions caused by noise under the control of the railroad, in clean, safe, and sanitary quarters; . . . .

N & W argues "[e]ven assuming *arguendo* that Jamie Bailey proved a violation of Section 45 U.S.C. 62(a)(3) of the Hours of Service Act so as to constitute negligence *per se* under the FELA . . . his claim is still bound by the limitations of *Carlisle."* N & W argues *Capriotti* controls the issue. The *Capriotti* court noted,

[i]n this case, plaintiff does not seek to recover directly under the [Hours of Service Act], but seeks to recover under FELA, and thus, despite invoking the relaxed standards of proof under negligence per se, he is still bound by the FELA parameters established in *Carlisle;* . . . in emotional distress cases the plaintiff must prove that he was within the zone of danger.

*Capriotti,* 878 F.Supp. at 434. In our view, for the reasons previously discussed *Gottshall/Carlisle* does not apply. This is not an emotional distress case, nor is it a work-related-stress case. Subpoint denied.

N & W argues the trial court erred when it instructed the jury not to consider opinion testimony of a doctor who testified for N & W and offered an opinion which conflicted with his deposition testimony. The instruction was the court's remedy for N & W's failure to alert Bailey of the surprise testimony. It assigns six reasons why this was reversible error. The trial court held:

Dr. Geltman's deposition testimony earlier taken as a whole was to the effect . . . he did not believe that the working conditions were a significant cause of [Bailey's] heart disease, that he was unwilling to rule out categorically that it played an insignificant or insubstantial or minor role in causing [Bailey's] heart disease.

The essence of his testimony in trial was that he categorically ruled out that there was even a minor or insubstantial causal

relationship between the working conditions and the heart disease.... [T]his was a significant change in his testimony between the deposition and the trial.

The trial court instructed the jury:

The opinion of Dr. Edward Geltman that plaintiff Jamie Bailey's work schedule, sleep deprivation and circadian rhythm disruption, was not even an insignificant cause of Jamie Bailey's atherosclerotic heart condition, is stricken from the record and you shall not consider such evidence in arriving at your verdicts.

Obviously, the trial court concluded the expert's changed testimony was an unfair surprise.

█ N & W first argues the trial court erred because Dr. Geltman's opinion and testimony at trial had not changed from his deposition testimony. Dr. Geltman gave two depositions, one in 1993 and one in 1995. In his first deposition Dr. Geltman testified that inadequate sleep, improper diet, overexertion and harassment "are relatively minor contributors to the development of various forms of heart disease. Not absolutely unrelated, but relatively minor contributors." He also testified "I cannot exclude [stress related factors] 100 percent, but I believe that it is a very minor contributor."

Near the end of his testimony in his first deposition Geltman testified:

I believe that these various factors alleged to have been applied to Mr. Bailey by the railroad certainly are not major contributors. I did not say they had zero effect, but I also cannot say to a reasonable degree of medical certainty they had any effect. *I can't say that they didn't have any effects,* but I can't say to a reasonable degree of medical certainty that they contributed. (Our emphasis.)

In his second deposition Dr. Geltman testified that the association between shift work, disturbances in diurnal variation and circadian rhythm, and atherosclerosis, coronary artery disease and peptic ulcer disease is "very loose."

I believe there is no consensus in the medical community that disturbances of circadian rhythm as occur in shift work are any kind of meaningful risk factor for coronary artery disease. Especially when compared to the standard risk factors of lipid abnormalities, hypercholesterolemia, family history, hypertension, diabetes, smoking, all the standard risk factors. Of those, if you factor in all of those, any effect, if any, of the shift work is trivial or very minor.

Throughout his second deposition, Dr. Geltman conceded he could not categorically rule out Bailey's work schedule and sleep disruption as a cause of his coronary artery disease or gastritis. At trial Dr. Geltman testified he did not find a causal relationship between Bailey's work schedule or the conditions of his dormitory and his heart disease. Bailey's attorney, during cross-examination, read excerpts of Dr. Geltman's deposition testimony that "any effect, if any, of the shift work is trivial or minor." He asked Dr. Geltman, "Was that your testimony?" Dr. Geltman responded, "Yes, it was." Bailey's attorney then asked, "But today you're ruling it out completely?" Dr. Geltman responded, "Yes."

N & W relies on a solitary passage of Dr. Geltman's deposition testimony to argue Dr. Geltman did rule out completely Bailey's shift work as a cause of his disease. N & W relies on Dr. Geltman's testimony that "I'm not sure I would phrase it the way that nothing ever makes a difference one whit because that makes me sound insensitive. I believe that there's not a causative relationship between his shift schedule and his having had an angioplasty."

This testimony, read in isolation, eliminates the shift schedule as a cause for Bailey's *angioplasty.* However, shortly after giving this opinion, Dr. Geltman, clarified whether he knew if shift work over a long duration could contribute to the development of atherosclerosis. He testified, "I don't know whether or not, even though there was a statistical association, whether that was meaningful or not in terms of causation in Mr. Bailey." Throughout his deposition testimony Geltman did not completely rule out Bailey's erratic work schedule and his inadequate sleeping dormitory as a cause of his coronary artery disease and gastritis.

The record supports a trial court finding Dr. Geltman's opinion clearly changed between the time he gave his depositions and when he testified at trial. Dr. Geltman agreed he had changed his opinion.

■■■ The trial court found: (1) Dr. Geltman's opinion had significantly changed between the depositions and trial; (2) "there was no supplementation of the deposition"; and (3) "[a]s a consequence, ... Rule 56 has been violated." The trial court has broad discretion in fashioning a remedy for the failure of a party to properly disclose the opinions of its experts or the factual basis for reaching their conclusions. *Cremer v. Missouri Pacific Railroad Company*, 811 S.W.2d 23, 25 (Mo.App.1991).

N & W argues Rule 56.01(e)(2) applies to changes in responses to *written interrogatories* and not to deposition testimony. Rule 56.01(e)(2) states:

**(e) Supplementation of Responses.** A party who has responded to written interrogatories with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired, except as follows:

....

(2) A party is under a duty to amend a prior response seasonably if the party obtains information upon the basis of which the party knows that the response (A) was incorrect when made or (B) though correct when made is no longer true.

In *Gassen v. Woy, M.D.*, 785 S.W.2d 601 (Mo.App.1990), the Western District of this Court held:

The rules make no express provision, in the case of pre-trial discovery by deposition, for an obligation to supplement responses under similar circumstances where a truthful answer when given later ceases to be correct. Considered as a whole, however, the rules and the case authority suggest that such duty is implied as a component of the discovery process.

*Id.* at 603. The Eastern and Southern Districts of this Court have never explicitly adopted the *Woy, M.D.* reasoning. *See Stallings v. Washington University*, 794 S.W.2d 264 (Mo.App.1990); and *Darnaby v. Sundstrom*, 875 S.W.2d 195 (Mo.App.S.D. 1994).

The rules relating to discovery were designed to eliminate, as far as possible, concealment and surprise in the trial of lawsuits and to provide a party with access to anything that is "relevant" to the proceedings and subject matter of the case not protected by privilege. *State ex rel. Plank v. Koehr*, 831 S.W.2d 926, 927 (Mo. banc 1992).

Rule 56.01(b)(4)(b) provides:

(4) *Trial Preparation: Experts.* Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of Rule 56.01(b)(1) and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

....

(b) A party may discover by deposition the facts and opinions to which the expert is expected to testify.

Under this rule, Bailey was entitled to discover by deposition the facts and opinions to which Dr. Geltman was expected to testify. Bailey's attorney relied on Dr. Geltman's deposition testimony that he could not categorically rule out Bailey's injuries were related to his work conditions. In his opening statement, Bailey's attorney explained to the jury that his opening statement is not evidence but "if I tell you that something's going to be in evidence, it's really my assurance or my promise to you that's what I'm going to prove and I want you to hold me to that...." Later in the opening statement he spoke of the evidence saying,

You're going to hear some contrary evidence ... [however,] [n]o doctor is going to look at you and say, "No, I rule out that possibility."

What they're all going to say is okay, ... even assuming that Jamie Bailey's work and sleep arrangement and lodging and fatigue was a factor in bringing about heart disease and ulcers, it was minimal, they're going to say it was negligible by comparison to the primary risk factors....

When Dr. Geltman changed his opinion at trial and categorically ruled out Bailey's work conditions as a cause, even an insignifi-

cant cause, he gave surprising testimony. The surprise, distinguished from the nature of the revised opinion, created a possibility of prejudice which the trial court "cured" by a withdrawal instruction. To allow an expert to change his opinion after deposition and before trial without notice to the opposing party would frustrate the purpose of Rule 56.01(b)(4)(b). Allowing such changes in opinion after an opening statement relying on the deposition opinion, without sanction, would prevent a party from discovering by deposition the actual facts and opinions to which the expert is expected to testify. It would also run counter to the purpose of discovery rules to eliminate, as far as possible, concealment and surprise in the trial of lawsuits. *State ex rel. Plank*, 831 S.W.2d at 927.

We hold the trial court did not abuse its discretion when it instructed the jury to disregard Dr. Geltman's testimony "that plaintiff Jamie Bailey's work schedule, sleep deprivation and circadian rhythm disruption, was not even an insignificant cause of Jamie Bailey's atherosclerotic heart condition," because the trial testimony conflicted with plaintiff's opening statement. By so instructing, the trial court merely maintained the position of the parties during discovery and at the beginning of the trial. It also protected the integrity of the discovery process.

■ N & W also argues the trial court gave a defective withdrawal instruction. M.A.I. 34.01 Fourth Edition provides,

**34.01 [1978 Revision] Withdrawal Instructions—General Comment**

A withdrawal instruction is only to be given when during the course of the trial a false issue, improper evidence, or evidence of an abandoned issue has been injected. The purpose of a withdrawal instruction may be served by the court sustaining a motion to strike and admonishing the jury to disregard the evidence. However, in certain instances, the trial court may determine that such action is inadequate, inappropriate or untimely and that a written instruction is necessary.

. . . .

Evidence, rather than an entire issue, may also properly be withdrawn by instruction. In the event evidence, rather than an issue, is sought to be withdrawn from the jury's consideration, care must be taken that such evidence does not also concern an issue still before the jury.

N & W argues: (1) the trial court's striking of, and instructing to ignore, portions of Dr. Geltman's testimony was a "withdrawal instruction" governed by M.A.I. 34.01; (2) the "withdrawn" evidence concerned "an issue still before the jury", i.e. causation; and (3) the giving of the instruction constituted prejudicial error.

■ The trial court was not giving an M.A.I. 34.01 "Withdrawal Instruction." None of the stated purposes for such instruction were involved. It was merely striking testimony as a sanction for N & W's failure to comply with discovery rules. The use of a withdrawal instruction under M.A.I. 34.01 is to avoid misleading the jury on a specious issue. *Bradley v. Browning–Ferris Industries, Inc.*, 779 S.W.2d 760, 765 (Mo.App. 1989). The purpose of the direction in this case was to protect the integrity of the discovery process, not to avoid misleading the jury on a false or abandoned issue or legally improper evidence. N & W's argument has no merit.

■ N & W also argues *"the trial court's Instruction was so poorly worded as to be confusing and misleading, and its prejudicial effect is demonstrated by the court's own comments regarding it."* N & W calls attention to the trial court's comment, "It seems to me to be an important issue. It seems to me as an issue the case can turn on. If the jury believed your witness today, his testimony here today, the plaintiff loses." The trial court was not commenting on the instruction, it was commenting on the potential prejudicial effect of Dr. Geltman's surprise testimony. The instruction's wording was clear and targeted to the surprise testimony. In his deposition Dr. Geltman could not rule out sleep deprivation as possibly being an insignificant cause of Bailey's injuries. The instruction was a trial court remedy intended to restore the status quo ante. It was not misleading or confusing.

■ N & W also argues the striking of testimony was unwarranted in light of the facts reflected in the record. It argues, "[Bailey] wanted (and persuaded the Court to give him) the best of two worlds: to attempt to discredit [N & W's] key witness by confrontation and cross-examination, and then to sandbag the defense by having the Court strike Dr. Geltman's testimony and thereby destroy [N & W's] case."

During his direct testimony, Dr. Geltman eliminated Bailey's shift work, circadian disruption and sleep deprivation as a cause of his coronary artery disease. Bailey, during cross-examination, obtained a concession that Dr. Geltman's direct testimony represented a change in his opinion given at deposition. The cross-examination confirmed Dr. Geltman intended to render a new opinion when he testified on direct, "there's no credible evidence to show that the conditions at the dormitory or [Bailey's] work schedule *in any way* contributed to his development of coronary artery disease." (Our emphasis.) If Bailey received a dual benefit, it was deemed necessary by a failure to inform him before trial that Dr. Geltman was going to testify there was no causation. The trial court acted well within its discretion when it withdrew Geltman's surprise opinion testimony.

■ In its final point, N & W argues the trial court erred in refusing to give its contributory negligence instruction C. The trial court gave N & W's tendered Jury Instruction No. 10, which substantially duplicated Instruction C except it omitted the clause "or plaintiff failed to disclose to defendant that he had heart or gastrointestinal problems...."

N & W argues it had adduced ample evidence of the fact that Bailey failed to inform N & W of his heart and gastritis problems. N & W offered, and the court refused, the following instruction:

You must find plaintiff contributorily negligent if you believe:

First, plaintiff failed to follow a low fat diet; *or plaintiff failed to disclose to defendant that he had heart or gastrointestinal problems,* and

Second, plaintiff in any one or more of the respects submitted in Paragraph First, was thereby negligent, and

Third, such negligence of plaintiff directly contributed to cause his injury.

(Our emphasis.)

■ Trial courts are obligated to submit a contributory negligence instruction if there is slight proof of contributory negligence. *Mateer v. Union Pacific Systems,* 873 S.W.2d 239, 243 (Mo.App.E.D.1993). In *Conley v. Burlington Northern Railroad Company,* 765 S.W.2d 272 (Mo.App.1988), we held the trial court had not erred in submitting a contributory negligence instruction where plaintiff failed to report pain resulting from continuing to work on a sprained ankle. *Id.* at 275. We observed,

A layman is held to know what the experiences of daily life teach and that which is commonly understood and believed. The jury could believe that plaintiff knew or should have known that he was risking some damage to his sprained ankle by continuing to work upon the painful ankle, and that his failure to report the pain was negligence on his part—even though, as was no doubt the case, he did not realize the extent of the disability which might result, or ... he "did not know and appreciate the gravity of the consequences."

*Id.* at 274. In *Mateer,* plaintiff brought suit under FELA for back injuries allegedly caused by repetitive traumas arising from the daily duties of his railroad work. We held the trial court properly rejected a contributory negligence instruction because it was not supported by the evidence. *Mateer,* 873 S.W.2d at 244. We noted all the medical authorities who had examined Mateer prior to 1987, attempted to find causation on the basis of conditions unrelated to his work. *Id.* "Mateer, as a layman, cannot be held to possess knowledge that performance of his duties as a lube person were causing a back problem where none of the medical authorities reached that diagnosis prior to 1987." *Id.* The duty to report and desist depends on employee knowledge of work related causation of injury. There was no evidence to support the finding Bailey knew or should have known N & W's sleeping facilities and

his erratic work schedule were medical causes of his coronary artery disease and gastritis.

Furthermore, no evidence was presented to support a finding that Bailey's failure to disclose to N & W his coronary artery disease and gastritis directly contributed to exacerbate his medical condition. N & W defended on the basis the dormitory and work conditions did not cause disruption of sleep and circadian rhythms and did not contribute to Bailey's physical injuries. Even had Bailey known and informed N & W that his working conditions caused his heart and stomach diseases, N & W would not have made any changes in the dormitory which it knew was substandard. It has consistently refused to accept the conditions as a cause of Bailey's injuries. Point denied.

We affirm.

RHODES RUSSELL, P.J., and SIMON, J., concur.