**Blanche VITITOE, et al., Plaintiffs–Appellants,**

v.

**LESTER E. COX MEDICAL CENTERS and John A. Duff, M.D., Defendants–Respondents.**

**No. 22949.**

Missouri Court of Appeals, Southern District, Division One.

Aug. 2, 2000.

Motion for Rehearing or Transfer to Supreme Court Denied Aug. 23, 2000.

Robert W. Freeman, Springfield, for appellant.

Donald R. Duncan, Turner, Reid , Duncan, Loomer & Patton, Springfield, for Respondent Cox.

Ken. D. Rogers, David C. Vaughn, III, Fredrick, Rogers & Vaughn, Springfield, for respondent Duff.

JOHN E. PARRISH, Judge.

Blanche Vititoe and Geneva Long (plaintiffs) appeal a defendants' judgment in an action they brought against Lester E. Cox Medical Centers (Cox), a Missouri corporation, and John A. Duff, M.D.[1] Count I was a wrongful death claim arising from the death of plaintiffs' father, Alfred A. Long. Count II was a claim for injuries allegedly caused by defective medical care Mr. Long received. Count III sought recovery for damages Mr. Long sustained between the time of his medical treatments and the time of his death. Plaintiffs also sought punitive damages from Dr. Duff (Count IV) and Cox (Count V) arising from alleged "aggravating circumstances." This court affirms.

In June 1995 Mr. Long was living with his daughter, Blanche Vititoe, in Springfield, Missouri, when he experienced difficulty breathing, looked pale and felt clammy. He was transported to Cox North, then transported to Cox South and admitted to the cardiac monitoring unit. He was a patient of Dr. Duff.

When Mr. Long was admitted to Cox South, a physician covering for Dr. Duff, Dr. Randolph, initially treated him. The following two days were over a weekend. Another physician who was covering for Dr. Duff, Dr. Dasovich, treated Mr. Long. Dr. Duff saw Mr. Long on Monday, June 5. Dr. Duff was asked at deposition if he advised Mr. Long that he had a heart attack during his June 2 hospitalization.

He answered, "Yes." Dr. Duff was then asked when he thought he told Mr. Long that he had experienced a heart attack. Dr. Duff answered, "On his day of discharge." Dr. Duff did not remember if anyone else was present at that time.

Hospital records indicate Dr. Duff's principal diagnosis was "pneumonitis versus bronchitis." Four secondary diagnoses were listed, "congestive heart failure," "acute bronchitis," "history of colon carcinoma," and "diabetes mellitus without complication, type II." Dr. Duff discharged Mr. Long from the hospital on June 5. He saw Mr. Long for follow-up visits on June 14 and July 12.

On September 3, 1995, Mr. Long experienced the same symptoms he had experienced on June 2. He had difficulty breathing and was pale. An ambulance and two paramedics were dispatched. The paramedics were Judy Lodwick and Cheryl Rackers, employees of Cox. The paramedics loaded Mr. Long onto a cot and attempted to place the cot inside the ambulance. As they attempted to place the cot in the ambulance, its leg mechanism malfunctioned. The cot legs failed to fold under the cot to allow the cot to roll into the ambulance. While the paramedics were attempting to get the cot into the ambulance, the cot collapsed and fell. Mr. Long was strapped to the cot when it fell to the pavement. Firemen had arrived at the scene. They assisted in loading the cot into the ambulance. Mr. Long was then transported to Cox South.

An emergency room physician, Dr. Kenyon, believed Mr. Long was suffering from acute myocardial infarction; that he had experienced a heart attack. Dr. Dasovich was on call for Dr. Duff. Dr. Kenyon consulted with Dr. Dasovich. Dr. Dasovich examined Mr. Long and agreed with Dr. Kenyon's diagnosis. Dr. Dasovich be-

1. Plaintiffs' lawsuit originally included a count (Count II of their petition) against Ferno–Washington, Inc., a medical equipment manufacturer. Plaintiffs subsequently dis-

missed that claim. Cox also dismissed a third-party petition it filed against Ferno–Washington, Inc.

lieved Mr. Long was suffering from acute, complicated myocardial infarction, hypotension and congestive heart failure. Mr. Long died later that day due to complications from the heart attack.

Plaintiffs' petition alleged that Dr. Duff was negligent in, among other things, failing to diagnose that Mr. Long had suffered a myocardial infarction prior to Mr. Long's admission to Cox Hospital on June 2, 1995; failing to advise Mr. Long that he had suffered a heart attack and needed treatment for the underlying cause of that condition; and failing to order appropriate tests to determine the extent of Mr. Long's coronary disease and the treatment needed for his condition.

The petition alleged that Cox was negligent in supplying a defective cot for use in transporting Mr. Long by ambulance. Plaintiffs alleged Cox's employees were negligent in allowing the cot to fall to the ground; that Cox's negligence directly caused or contributed to cause Mr. Long's death.

### Point I – Closing Argument

Cox's attorney's closing argument included:

But last Tuesday about this time, I laid out you for [sic] what the case would be for and against Cox. And I told you the three things that would come against Cox, the three allegations, the three charges. And let me bring those down to the bare bones of what is being charged against Cox.

The first one is that we furnished a bad cot or that we didn't take care of our cots generally, this cot or all cots, or Cheryl and Judy were negligent—listen carefully—they were negligent because they believed the cot would stand on its own legs if one of them wasn't squeezing and holding squeezed that foot end release lever. They believed that.

The allegation is that that's negligence.

Then in addition to one or the other of those first two, the case against Cox would come down to the collapsing of the cot—listen carefully now—directly caused or directly contributed to cause Alfred Long's death.

Now since last Tuesday, there is a fourth thing. And that fourth thing is that we, Cox Medical Center, should have known that this was going to happen. We could have known that this was going to happen, and therefore, we were completely indifferent or consciously disregarded safety. That's what has been brought against Cox.

Let me be perfectly clear with you. Plaintiffs have brought this last allegation to try to make a verdict beyond—

[The trial judge interrupted Cox's attorney stating that a juror desired a break and declaring a recess. Following the recess, Cox's attorney continued.]

Thank you, Your Honor. I believe what I was doing, what I was saying was that this fourth allegation that we are now facing, that we were completely indifferent, or consciously disregarded safety, is an effort to get a verdict higher than the actual losses. And it's an effort to punish Cox. That's what that's for.

Let me make one other thing clear, and that is these allegations that I've outlined for you are the only allegations that you can consider. The reason I say that is because there have been some other critical—

Plaintiffs' attorney interrupted stating, "I object to any reference of things not being considered. The jury considers everything that came in on the evidence." The trial court overruled the objection stating:

The jury has heard the evidence and heard my ruling on the objections, and they know what to exclude, and have been instructed to only consider those facts that are still alive in the trial.

So with that admonition, I'll let you continue and overrule the objection, Mr. Duncan.[2]

Cox's attorney continued:

Critical comments related to the hospital that do not relate to those things; that is, we are not doing our maintenance right. Cheryl and Judy were negligent. And that directly caused or directly contributed to cause his death, or that we were completely indifferent, and completely disregarded safety. Anything other than that that's critical of the hospital that has come into this case—

Plaintiffs' attorney asked to approach the bench. At a bench conference he objected to Cox's attorney "making any implication that these jurors are supposed to disregard any fact." He argued that matters not withdrawn by means of jury instruction were relevant and objected to Cox's attorney "trying to instruct the jury at this point to disregard anything in the evidence."

■ The trial judge told the attorneys he had instructed the jury that they could consider all the evidence except what had been withdrawn because he had sustained objections;[3] that Cox's attorney could argue whether something was or was not relevant, "just like you arguing certain inferences." The objection was overruled.

Cox's attorney continued, "I believe what I was saying was that criticisms indirectly of Cox that don't relate to allegations that are made against us in this case, in my opinion, are not relevant to what you have to do." He then discussed various aspects of the evidence that had been presented without further objection by plaintiffs.

Point I asserts the trial court erred in overruling plaintiffs' objections to statements made by Cox during closing argument "because such statements ... were misstatements of the applicable law and improper oral withdrawal instructions which attempted to withdraw from the jury's consideration relevant evidence ... and attempted to modify the court's verdict director against defendant Cox Hospital."[4]

■ As explained in *Lewis v. Bucyrus–Erie, Inc.*, 622 S.W.2d 920, 925 (Mo. banc 1981), "The trial court is possessed of broad discretion in the area of closing arguments, not likely to be disturbed on appeal." Trial counsel is afforded wide latitude in closing argument in arguing facts and drawing inferences from the evidence. *Id.* at 926, citing *Arroyo v. Keller*, 433 S.W.2d 584, 588 (Mo.App.1968). This court finds no abuse of discretion by the trial court in overruling plaintiffs' objections to Cox's oral argument. Point I is denied.

2. Cox's attorney is Mr. Donald R. Duncan. Plaintiffs' attorney is Mr. Robert W. Freeman. Mr. Ken D. Rogers and Mr. David C. Vaughn III represent Dr. Duff.

3. MAI 2.01 [1996 Revision], the explanatory instruction given in all jury cases, includes *the explanation and direction:*

. . .

The evidence may include the testimony of witnesses who appear personally here in court, the testimony of witnesses who may not appear personally but whose testimony may be read or shown to you, and exhibits such as pictures, documents, and other objects.

. . .

There will be some matters which will be offered by the parties and to which objec-

tions will be made. If I overrule the objections, you may consider that matter when you deliberate on the case. If I sustain an objection, then that matter and any matter I order to be stricken is excluded and must not be considered by you in your deliberations. . . .

"Appellate courts presume that the juries follow their instructions." *State v. Howard*, 896 S.W.2d 471, 484 (Mo.App.1995).

4. Plaintiffs' brief complains that Cox's attorney told the jury, "I'll tell you what is not in this case, any facts other than those allegations are not in this case against Cox." The brief does not cite where in the transcript this remark appears. This court's review of the transcript did not find that statement.

*Point II – Supplementing Discovery*

Point II asserts the trial court erred in denying plaintiffs' objections to Cox being permitted to elicit trial testimony from Jerry Doris, Terry Cline and Kevin Smart, regarding examinations of the cot used in transporting Mr. Long to Cox South on September 3. Plaintiffs argue it was error to permit the witnesses to testify "because said witnesses were not disclosed to plaintiffs prior to trial and their testimony is contrary to the deposition testimony of defendant Cox's designated corporate representative who had stated Cox Hospital did not know who had examined said ambulance cot after it was returned from transporting Alfred Long on September 3, 1995." Plaintiffs complain that "Cox failed to supplement the deposition testimony of its designated corporate representative to identify the three witnesses in a timely manner prior to trial."

Point II is predicated on deposition testimony elicited from Mark Alexander, Cox's corporate representative. Mr. Alexander was deposed for purposes of discovery. The record on appeal does not include a copy of that deposition. Parts of the deposition were offered as evidence at trial, including the following (read by plaintiffs' attorney):

Then the question, "Is it your testimony that there were any tests performed upon that cot after it was returned from picking up Alfred Long on September 3rd, 1995?"

Answer, "I know the cot was taken out of service after this call. I know that the cot was checked for its function, and was subsequently placed back into service. There are no documents attesting to that. And the exact time frame from which that check and the cot being placed back into service, I cannot testify to specifically the exact time that that occurred?"

Question, "Do you have a ballpark [sic] of when that cot was placed back into service?"

Answer, "My belief is that it was within the 24–hour period following this particular transport of Mr. Long."

Question, "Do you know who performed any tests on the Ferno cot after it returned from transporting Mr. Long?"

Answer, "I have not been able to determine the exact identity of the individual that did that."

At trial Cox called three employees in its emergency department as witnesses, Jerry Doris, Terry Cline and Kevin Smart. They testified, over the objection of plaintiffs, concerning their examination and testing of the cot used to transport Mr. Long. Immediately prior to those witnesses' testimony, plaintiffs' attorney requested that Cox be prohibited from presenting witnesses who would testify "contrary to what Mr. Alexander said in his deposition." The trial court denied plaintiffs' request.

Mr. Doris testified that he looked at the cot used to transport Mr. Long a few days after the fall to see if it was broken. Mr. Cline testified that he also looked at the cot after Mr. Long was transported. Mr. Cline said he "loaded it and unloaded it into the car several times."

Mr. Smart said he maintained the cots at the time the one used to transport Mr. Long collapsed. He explained what he did after the incident was reported:

... So I took the cot, as I would any cot, take it through all the motions. You know, Ferno says, you know, lower it to the ground, bring it back up, put it in load, you know, check everything to make sure that it was functioning like it should. And I did. Everything worked smooth.

I then crawled on top of the cot, and I shook it, kind of jumped up and down with it in the load position, and unlocked. Because, you know, that way if it's going to fall, you know, I weigh 250 pounds, and I was jumping up and down on it. . . .

After I did all that, I then, as I always did with the cot, I went ahead and cleaned the old lubrication off. Because you had an I-beam slide down through there, that had lithium grease on it. The head end had some lithium grease, and I cleaned all that up. And then I relubed it, you know, put more—mainly you use lithium grease on those slide areas like that.

And after I did that, I called Ed Harris[5] and told Ed, I said Ed, I can't find anything wrong with the cot. I, you know jumped on it, shook it, wiggled everything, cleaned it, took the old lubrication off, and reapplied new lube.

Rule 56.01(e)(1) and (2) requires a party who responds to written interrogatories to supplement answers to interrogatories seeking the identity and location of persons having knowledge of discoverable matters and the identity of expert witnesses expected to be called at trial if the party answering the interrogatories obtains information that discloses the answer was incorrect when made or is no longer true even though it was correct when given. The rule does not apply in this case. The answer plaintiffs assert should have been supplemented was a response to a question asked in a deposition, not an answer to an interrogatory.

The Western District of this court held in *Gassen v. Woy*, 785 S.W.2d 601, 603–04 (Mo.App.1990), that expert witnesses are required to supplement answers they give by deposition if they later change their opinion or base their opinion on new or different facts from those disclosed in the deposition. The Eastern District reached a similar result in *Bailey v. Norfolk & Western Railway Co.*, 942 S.W.2d 404 (Mo. App.1997). *Bailey* held that a trial court did not err in instructing the jury to disre-

gard an expert witness' testimony that conflicted with the expert's deposition testimony—testimony relied on by opposing counsel in his opening statement.

*Bailey* explains:

Rule 56.01(b)(4)(b) provides[6]:

(4) *Trial Preparation: Experts.* Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of Rule 56.01(b)(1) and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

. . .

(b) A party may discover by deposition the facts and opinions to which the expert is expected to testify.

. . .

. . . To allow an expert to change his opinion after deposition and before trial without notice to the opposing party would frustrate the purpose of Rule 56.01(b)(4)(b). Allowing such changes in opinion after an opening statement relying on the deposition opinion, without sanction, would prevent a party from discovering by deposition the actual facts and opinions to which the expert is expected to testify. It would also run counter to the purpose of discovery rules to eliminate, as far as possible, concealment and surprise in the trial of lawsuits. *State ex rel. Plank [v. Koehr]*, 831 S.W.2d [926] at 927 [ (Mo.banc 1992) ].

*Id.* at 414–15.

◼ Plaintiffs did not seek the identity of persons who had examined or tested the cot by interrogatory.[7] The person de-

---

**5.** The testimony did not disclose the position Mr. Harris held.

**6.** The part of Rule 56.01(b) quoted in *Bailey* is unchanged in the current version of that rule.

**7.** Plaintiffs suggest the facts of this case are similar to *Crompton v. Curtis–Toledo, Inc.,*

661 S.W.2d 645 (Mo.App.1983), in which a party was determined to have a continuing duty to supplement discovery responses. *Crompton* differs from this case in that the identity of the witness in question was requested during a deposition and by interrogatory, thus Rule 56.01(e) was applicable.

posed, Mr. Alexander, was not an expert. The question he was asked concerning the identity of anyone who performed tests on the cot used to transport Mr. Long was not an inquiry to an expert witness that required supplementation. The trial court did not err in permitting Mr. Doris, Mr. Cline and Mr. Smart to testify at trial. Point II is denied.

### Point III – Cross-examination of Dr. Whiting

Point III is directed to the cross-examination of Dr. Richard B. Whiting, a cardiologist who testified as an expert witness for Dr. Duff. Plaintiffs contend the trial court erred in sustaining objections to questions they posed to Dr. Whiting.

The following occurred during plaintiffs' attorney's cross-examination of Dr. Whiting:

Q. If a person has a heart attack similar to what Alfred Long has, and we need to be fair, we need to keep this in September of 1995?

A. Okay.

Q. You would order a beta blocker, wouldn't you?

[Dr. Duff's attorney]: Your Honor, I object. It's irrelevant what he would have personally done. It's outside the standard of care for ordinary physicians. This is Dr. Duff.

The Court: Sustained.

. . .

Q. [By plaintiffs' attorney] At the time of discharge, June 5th, '95, within that time frame, do you agree the standard of care on June 5th, 1995, in the condition such as Alfred Long was to prescribe a beta blocker and an aspirin, a very minimum, very minimum?

A. A patient like Mr. Long?

Q. Yes.

A. I'd say no.

Q. Why?

A. Because there's at least three reasons why a very careful internist would not want to use a beta blocker. He'd just had heart failure, he had had bronchial spasm that's what they call wheezing, and he also has diabetes.

There's three things that would make, that would make you think twice about using a beta blocker, not that you cannot use it, but that you'd be a little bit hesitant because all three of those conditions have relative, not absolute, relative contraindications.

Q. I noticed you kind of qualified that and said an internist. Do you think an internist has a separate standard of care from a cardiologist?

A. No, but I think they may be a little bit more cautious than some of the cardiologists that I know who might be a little bit more cavalier and say let's use the beta blocker.

Q. So you agree that most cardiologists would say let's use the beta blocker?

[Dr. Duff's attorney]: Again, I object. That's not the standard of care for an internist such as Dr. Duff.

The Court: Sustained.

Plaintiffs contend the trial court erred in sustaining the objections to the questions asked Dr. Whiting "because (1) Dr. Duff had previously testified he did not use a beta blocker because he believed them to have been contraindicated in this case and, (2) because the bias of Dr. Whiting had been established by evidence that he was Dr. Duff's expert witness; that Dr. Duff and Dr. Whiting had trained together and were good friends; and that Dr. Whiting was not charging a fee for his services in this case." Point III asserts that the "questions were relevant to impeach both Dr. Duff and Dr. Whiting."

There was no interrogatory in this case that requested the identity of witnesses who exam-ined the cot used to transport Mr. Long. Rule 56.01(e) does not apply to this case.

Plaintiffs' argument in support of Point III states:

> Thus, if Plaintiffs' counsel could have elicited an affirmative response from Dr. Whiting on either questions such as he would have used a beta blocker on Alfred Long in 1995, or most cardiologists would have used beta blockers, then it would have served to contradict and impeach Dr. Duff's position that beta blockers were contraindicated for Alfred Long in 1995 and supported Dr. Marsh's[8] testimony that beta blockers should have been given. Also, such admission by Dr. Whiting would serve to impeach Dr. Whiting who had testified that he believed Dr. Duff treated Alfred Long appropriately.

■ No offer of proof was made as to what Dr. Whiting's responses would have been. "The general rule is that nothing is preserved for appellate review when a trial court rejects evidence in the absence of an offer of proof." *Meyers v. Southern Builders, Inc.,* 7 S.W.3d 507, 516 (Mo.App. 1999). Regardless, plaintiffs' argument is without merit in that plaintiffs' questions did not seek information concerning the requisite standard of care required by members of Dr. Duff's profession. The requisite standard of care is that degree of skill and learning ordinarily exercised under the same or similar circumstances by members of the profession. *Lashmet v. McQueary,* 954 S.W.2d 546, 551 (Mo.App. 1997). "[T]he individualized practice or custom of a physician does not constitute the appropriate standard of care." *Allen v. Grebe,* 950 S.W.2d 563, 568 (Mo.App. 1997). The questions to which the trial court sustained objections were not relevant to the issue in the case, whether the care Dr. Duff rendered was consistent with the degree of skill and learning ordinarily exercised under the same or similar circumstances by members of this profession. Point III is denied. The judgment is affirmed.

8. Dr. Henry Marsh testified as an expert witness in plaintiffs' case in chief.

SHRUM and MONTGOMERY, JJ., concur.

CROW, P.J., recused.