

FILED

May 11 2017, 6:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Tina M. Bell
Katherine A. Brown-Henry
Cline Farrell Christie & Lee, P.C.
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
INDIANA TRIAL LAWYERS
ASSOCIATION

Jerry Garau
Garau Germano, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Karl L. Mulvaney
Nana Quay-Smith
Jessica Whelan
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

Mark W. Baeverstad
Rothberg Logan & Warsco LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

David Oaks,

*Appellant-Plaintiff,*

v.

Timothy R. Chamberlain, M.D.,

*Appellee-Defendant.*

May 11, 2017

Court of Appeals Case No.
92A04-1609-CC-2041

Appeal from the Whitley Circuit Court

The Honorable David J. Avery, Special Judge

Trial Court Cause No.
92C01-1303-CC-112

**Najam, Judge.**

## Statement of the Case

In this medical malpractice case, David Oaks appeals the trial court's decision to exclude his cross-examination of an adverse expert witness about the expert's personal medical practices. He raises two issues on appeal, which we restate as follows:

1. Whether the trial court abused its discretion when it excluded the cross-examination of a medical expert about his personal medical practices, which Oaks sought to elicit for the purpose of impeaching the expert's testimony on the standard of care.

2. Whether the exclusion of that testimony was harmless error.

We reverse and remand with instructions.

## Facts and Procedural History

On December 7, 2009, Oaks presented to the emergency room at Whitley County Hospital with shortness of breath and a cough. He was fifty-six years old at the time and had a history of chronic obstructive pulmonary disease ("COPD"). By December 9, Oaks had developed a low-grade fever and was having gastrointestinal problems and abdominal pain. A CT scan of Oaks' chest revealed several gallstones and a dilated transverse colon, which measured around seven centimeters in diameter.

On December 10, Dr. Timothy R. Chamberlain saw Oaks for a consultation and noted that Oaks had moderate distention of the abdomen, particularly in the upper-right quadrant, had guarding of the upper-right quadrant, and

complained of mild bloating and upper abdominal discomfort. Dr. Chamberlain also noted that Oaks had an elevated temperature and that CT and ultrasound results showed he had gallstones. Dr. Chamberlain noted the risk of surgery for a patient with Oaks' medical history but stated in his plan that he wanted to "recheck [Oaks'] abdominal films and consider the possibility of a laparoscopic cholecystectomy." Appellant's App. Vol. II at 211-12. On December 11, Dr. Chamberlain ordered an x-ray of Oaks' abdomen. The imaging report revealed that Oaks had a "gas distended transverse colon," consistent with Oaks' prior chest CT scan, and that those "findings could represent local ileus[1] or low grade left hemicolon/proximal descending colon obstruction." *Id.* at 224.

[5] Based on the x-ray results and the entire clinical picture, Dr. Chamberlain suspected that Oaks had an early infection in his gallbladder. Dr. Chamberlain determined that gallbladder removal surgery was the proper course of treatment and that it would likely resolve the ileus in Oaks' colon, which Dr. Chamberlain believed was secondary to the gallbladder infection.

[6] Dr. Chamberlain performed laparoscopic surgery to remove Oaks' gallbladder on December 11. During surgery, Dr. Chamberlain saw that Oaks' colon was swollen. After surgery, Dr. Chamberlain carefully monitored Oaks' condition, specifically, his swollen colon and continued ileus. Following Oaks' surgery,

---

[1] An ileus is a mild paralysis of the bowel in which the bowel becomes enlarged or dilated. Tr. Vol. III at 243.

he had no fever, his right upper quadrant pain was "minimal," and he began ambulating. Tr. Vol. III at 245. In order to stimulate the bowel and alleviate the ileus, Dr. Chamberlain reduced the amount of narcotics Oaks was taking and ordered the drug neostigmine. Subsequently, Oaks began passing gas on a regular basis, had several bowel movements, and his abdomen went from firm and distended to soft and not distended. Because he believed the clinical picture showed marked improvement, Dr. Chamberlain did not obtain x-ray images of Oaks' abdomen in the days following surgery.

[7] On the afternoon of December 15, Oaks' colon perforated, allowing air and fecal matter to escape into his abdomen. The perforation of the colon was due to a combination of enlargement of, and a lack of blood supply to, the colon. Dr. Chamberlain performed emergency surgery during which he repaired and resected the bowel and performed an anastomosis—a surgical procedure in which he reconnected the two ends of the bowel after the resection. During the surgery, Oaks' spleen was removed. Following the surgery, Oaks had various complications—including another perforation—and he required additional treatment and surgeries by other medical providers and a stay in a rehabilitation facility.

[8] On November 30, 2011, Oaks filed a proposed complaint for damages against Dr. Chamberlain with the Indiana Department of Insurance. On November 19, 2012, a medical review panel issued its opinion in favor of Dr. Chamberlain.

[9] On February 27, 2013, Oaks filed a complaint against Dr. Chamberlain with the trial court. The parties served their expert witness disclosures and, on October 10, 2014, Dr. Chamberlain filed a motion *in limine* seeking an order precluding any testimony that a medical expert would have treated a patient differently in the same situation as that in which Dr. Chamberlain treated Oaks. Oaks filed a response and, on October 28, the trial court held a hearing on the motion *in limine* and denied it.

[10] On July 27, 2015, the trial court conducted a telephonic status conference during which Oaks agreed to submit a written offer of proof regarding the testimony he would elicit at trial from Dr. Chamberlain's experts, namely, that they would have provided different medical treatment to a patient in the same situation. Both parties filed briefs on that issue. Oaks argued that the evidence of differing treatment would not be elicited to establish the applicable standard of care but only to impeach Dr. Chamberlain's experts' opinions on the standard of care. Oaks noted that one of Dr. Chamberlain's witnesses, Dr. Wayne Moore, had testified at a deposition that his personal practices differed from his opinion on the applicable standard of care.[2] Dr. Chamberlain renewed

---

[2] Dr. Moore's relevant deposition testimony was as follows:

| Oaks' Counsel: | [W]ould you want to get an x-ray at this point [the afternoon of August 14, 2009]? |
| Dr. Moore: | Are you asking me what I most likely would have done? |
| Oaks' Counsel: | Yes. |
| Dr. Moore: | I probably would have gotten an x-ray. |
| Oaks' Counsel: | And why would you probably have gotten an x-ray at this point? |

his motion *in limine* on that issue. He argued that testimony regarding differing treatment cannot be offered either to establish the applicable standard of care or to impeach Dr. Moore's testimony because it did not conflict with his standard of care testimony.

[11] The trial court conducted a five-day jury trial from August 15-19, 2016. Oaks offered the expert testimony of two general surgeons, Dr. David Befeler and Dr. Jeffrey Freed, both of whom testified that the standard of care for a general surgeon under the circumstances of the case required serial x-rays of Oaks' abdomen post-surgery and that Dr. Chamberlain had breached that standard of care.

[12] Dr. Chamberlain also offered the expert testimony of two general surgeons, Dr. Wayne Moore and Dr. Alex Cocco. These experts testified that, in their opinion, Dr. Chamberlain did not violate the standard of care for a general surgeon in treating Mr. Oaks. But Dr. Cocco did not testify about what the

---

Chamberlain's Counsel:   Objection, relevancy.

Dr. Moore:   To help me confirm what's going on with the patient.

Oaks' Counsel:   . . . When you say, "what's going on," what do you fear might be going on? . . .

Dr. Moore:   I would use the x-ray to help look at the NG [tube] placement if he still had an NG [tube] at the time. I would use it to help me get an idea are the intestines backing up more, like more of an ileus, or are they backing up less. If I had thought of an ileus from the beginning as opposed to Ogilvie's, I wouldn't have necessarily been thinking, oh, I need to check a film for Ogilvie's, because at this point the clinical picture is ileus.

Appellant's App. Vol. II at 159.

standard of care was, only that Dr. Chamberlain did not violate whatever Dr. Cocco thought the standard of care might be.

[13] Dr. Moore, on the other hand, testified that the standard of care required clinical monitoring of symptoms to determine whether the patient was improving and that x-rays would only be obtained if the patient was not showing "signs of progress." Tr. Vol. IV at 104. Dr. Moore testified that clinical monitoring of Oaks' post-operative symptoms indicated that Oaks' condition was improving; specifically, Oaks began having regular bowel sounds, bowel movements, and passing of gas, his bowel distention was slowly improving over time, and he reported that he felt better. Therefore, Dr. Moore testified, the standard of care did not require further x-rays.[3]

[14] Following Oaks' cross-examination of Dr. Moore and outside the presence of the jury, Oaks made an offer of proof and elicited testimony from Dr. Moore that showed that, if Oaks had been permitted to question Dr. Moore about his own personal medical practices, Dr. Moore would have testified that he would have obtained an x-ray in a post-operative situation like Oaks'.[4] The trial court

---

[3] Dr. Chamberlain is incorrect when he asserts that Dr. Moore testified that both clinical monitoring and x-rays were accepted treatment options within the standard of care in Oaks' situation. Dr. Chamberlain's counsel asked Dr. Moore on direct examination, "Do you believe that the standard of care require[d] Dr. Chamberlain to order serial x-rays of Mr. Oaks after his surgery?" Cite. Dr. Moore responded, "No, it does not." Tr. Vol. IV at 104.

[4] Specifically, after incorporating by reference his previously filed brief regarding his offer of proof, which included relevant parts of Dr. Moore's deposition testimony, Oaks' counsel asked Dr. Moore: "[I]s it in fact true that you would have gotten an x-ray in this situation?" Tr. Vol. IV at 168. Dr. Moore replied: "Yes." *Id.*

affirmed its prior decision[5] to exclude such testimony relating to Dr. Moore's personal medical practices, stating in relevant part:

> I don't disagree that there [are] instances where a physician . . . who is giving an opinion on standard of care . . . [can] have their opinion attacked by . . . demonstrating [that] even though they say this is the standard of care[,] . . . they do contrary to . . . the standard of care but they've testified what the standard of care would be. *I think the distinction in this situation was[,] you know[,] what was represented to me in argument, at least this afternoon, was that the doctor said standard of care was this but in his own personal practice, he practices above what he believes the standard of care to be and that's why I did not permit that.* If I can see other instances where that may come into play, that somebody says . . . this is the standard of care but then learn from their practice that they don't — that's not the practice that they would follow, so I think that's the distinction.

Tr. Vol. IV at 169-70 (emphasis added).

[15] On August 19, 2016, the jury returned a verdict in favor of Dr. Chamberlain and against Oaks. This appeal ensued.

# Discussion and Review

## *Standard of Review*

[16] Oaks contends that the trial court abused its discretion when it excluded Dr. Moore's expert medical testimony about his personal medical practices. The

---

[5] Although both parties state that the trial court had previously ruled to exclude testimony relating to Dr. Moore's personal medical practices, no such ruling appears in the record. Oaks states that the ruling was made off the record, and Dr. Chamberlain does not suggest otherwise. Appellant's Br. at 10.

decision to admit or exclude evidence and the scope and extent of cross-examination all lie within the sound discretion of the trial court, and we will not disturb the trial court's decision absent a showing of an abuse of that discretion. *See Jacobs v. State*, 22 N.E.3d 1286, 1288 (Ind. 2015). An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. *See Kosarko v. Padula*, 979 N.E.2d 144, 146 (Ind. 2012).

### Issue One: Testimony Concerning the Personal Practices of a Medical Expert Witness

*Waiver*

Before we reach the merits of Oaks' appeal with respect to the exclusion of Dr. Moore's testimony, we must address Dr. Chamberlain's assertion that Oaks waived the issue because he failed to object to Jury Instruction 15. *See, e.g.*, *Washington v. State*, 808 N.E.2d 617, 625 (Ind. 2004) (holding that, generally, a party waives an argument or issue on appeal if he did not raise it before the trial court). Jury Instruction 15, to which no one objected, stated:

> A general surgeon is allowed broad discretion in selecting treatment methods and is not limited to those most generally used.
>
> When more than one method of treatment is available, a general surgeon must use sound judgment in choosing which method to use.

> If a general surgeon uses sound judgment in selecting from a variety of accepted treatments, and uses reasonable care and skill in treating a patient, then the general surgeon is not responsible if the treatment does not succeed.
>
> *The fact that other methods existed, or that another general surgeon would have used a different method, does not establish medical negligence.*

Appellee's App. at 17 (emphasis added).

[18] Dr. Chamberlain contends that Jury Instruction 15 means that, in Indiana, personal medical practices of an expert witness are "irrelevant to the standard of care." Appellee Br. at 26. However, as Oaks points out, that is not what the instruction says. Rather, the instruction correctly notes that, when the standard of care allows for two or more different methods of treatment, a physician cannot be held liable simply for choosing one accepted method over another.[6] *Fridono v. Chuman*, 747 N.E.2d 610, 622 (Ind. Ct. App. 2001), *trans. denied*.

[19] But that is not the question presented in this case. Dr. Moore testified that the standard of care did *not* require x-rays for a patient in Oaks' post-operative condition but that, nevertheless, he would have ordered an x-ray in the same

---

[6] In fact, the last section of the jury instruction actually contemplates that medical malpractice cases *will* include testimony of "other methods" used by other surgeons and it simply instructs that such testimony cannot *establish negligence*. Of course, this section of the instruction would not be necessary if testimony about other physicians' personal practices were inadmissible to begin with.

situation.[7] Thus, Dr. Moore's testimony was not that he would personally prefer one accepted treatment (x-rays) over another (clinical monitoring), but that he would have ordered a procedure that he testified was not included in the standard of care at all (x-rays). Dr. Moore's testimony did not address other methods of accepted treatment. Thus, Jury Instruction 15 does not apply, and Oaks did not waive his appeal by failing to object to it.

*Admissibility of the Expert's Personal Practices*

[20] In medical malpractice cases, the parties usually must present medical expert testimony to establish the standard of care and whether particular acts or omissions by the health care provider met the standard of care. *Perry v. Anonymous Physician 1*, 25 N.E.3d 103, 107 (Ind. Ct. App. 2014), *trans. denied*. Here, Oaks' experts opined that the standard of care in Oaks' post-operative situation required serial x-rays, which Dr. Chamberlain did not order. But Dr. Chamberlain's expert, Dr. Moore, opined that the standard of care did not require x-rays. Thus, the jury had before it conflicting evidence on the standard of care. Oaks wished to use Dr. Moore's testimony that Dr. Moore would have ordered an x-ray in Oaks' situation to impeach Dr. Moore's testimony that the standard of care did not require x-rays. The trial court ruled that such

---

[7] Dr. Chamberlain periodically asserts that Dr. Moore's excluded testimony was that he only "probably" would have ordered an x-ray. While that was Dr. Moore's *deposition* testimony, Appellant's App. Vol. II at 159, his trial testimony during the offer of proof was that he *would* have ordered an x-ray, Tr. Vol. IV at 168.

impeachment testimony was inadmissible. We hold that the trial court's exclusion of this impeachment evidence was an abuse of discretion.

[21] Under Indiana Rule of Evidence 607, a witness's credibility may be attacked by any party, *Ingram v. State*, 715 N.E.2d 405, 407 (Ind. 1999), including through cross-examination, *Turner v. State*, 953 N.E.2d 1039, 1050-51 (Ind. 2011). "Cross-examination is permissible as to the subject matter covered on direct examination, including any matter which tends to elucidate, modify, explain, contradict or rebut testimony given during direct examination by the witness." *Hicks v. State*, 510 N.E.2d 676, 679 (Ind. 1987). Thus, in *Walker v. Cuppett*, 808 N.E.2d 85, 95 (Ind. Ct. App. 2004), we held that "[d]octors and other expert witnesses are not oracles whose opinions, once stated, cannot be questioned or refuted by other evidence, even if that evidence does not come in the form of another expert's testimony." And, as the United States Supreme Court has noted, "the time-honored process of cross-examination [is] the device best suited to determine the trustworthiness of testimonial evidence." *Watkins v. Sowders*, 449 U.S. 341, 349 n.4 (1981) (quoting with approval 5 J. Wigmore, Evidence § 1367 (Chadbourn rev. 1974) ("[cross-examination] is beyond any doubt the greatest legal engine ever invented for the discovery of truth.")).

[22] As the parties note, the specific question in this case is whether cross-examination of an adversary's medical expert on his or her personal practices can be used to impeach the expert's credibility regarding his or her opinion on the standard of care. There are no Indiana cases that directly address this issue. Some Indiana cases hold, in contexts other than medical malpractice, that

industry custom and practice is not admissible to establish the standard of care in the first instance but may be relevant to the standard of care once that standard has been established by other means. *See, e.g.*, *Hagerman Constr., Inc. v. Copeland*, 697 N.E.2d 948, 958 (Ind. Ct. App. 1998) (construction industry), *opinion amended on reh'g*, *trans. denied*; *Van Duyn v. Cook-Teague P'ship*, 694 N.E.2d 779, 782 (Ind. Ct. App. 1998) (laundromat industry), *trans. denied*. And our Supreme Court has held in the context of a medical malpractice case that a medical expert's affidavit that stated only what the expert would have done (and not what the standard of care was) was insufficient to establish the standard of care in the first instance. *Oelling v. Rao*, 593 N.E.2d 189, 190 (Ind. 1992). However, *Oelling* did not address the specific issue here: whether personal practices testimony would be relevant and admissible to impeach the credibility of the expert's standard of care testimony. *Id*.

[23] Oaks argues that we should allow evidence of personal medical practices to attack the testimony of a medical expert who has testified about the standard of care.[8] In support, both Oaks and amicus curiae Indiana Trial Lawyers Association note that the majority of other states to address this issue have held that an expert can be impeached with his personal practices when those practices differ from the expert's opinion about what is required under the standard of care.

---

[8] Oaks does not assert that he wishes to use the excluded testimony as evidence of the standard of care itself but, rather, only to question Moore's credibility with respect to his testimony about the standard of care.

For example, in *Jaynes v. McConnell*, 358 P.3d 632, 638 (Ariz. Ct. App. 2015), the court held that, where the personal practices of the medical expert went above and beyond the minimum standard of care the expert had described at trial, testimony about such personal practices was "relevant to assist the jury in its factually intensive determination of the relevant standard of care," and the testimony was also pertinent to the expert's "credibility as an expert witness by suggesting that his personal practices differ from the standard of care he espoused." *See also Smethers v. Campion*, 108 P.3d 946, 955 (Ariz. Ct. App. 2005); *Wallbank v. Rothenburg*, 74 P.3d 413, 416-17 (Colo. Ct. App. 2003); *Condra v. Atlanta Orthopaedic Group, P.C.*, 681 S.E.2d 152 (Ga. 2009). Similarly, other courts have held that, although the standard of care cannot be established solely through an expert's personal practices testimony, such testimony is nevertheless relevant to the expert's credibility and the persuasive value of his opinion on the standard of care. *See Jones v. Rallos*, 890 N.E.2d 1190, 1208 (Ill. Ct. App. 2008) (citing *Schmitz v. Binette*, 857 N.E.2d 846, 856-57 (Ill. Ct. App. 2006)).

As Dr. Chamberlain notes, there is one case from Missouri in which that state's intermediate appellate court upheld the exclusion of an expert's personal practices testimony either as evidence of the standard of care or to impeach the expert's opinion on the standard of care. *Vititoe v. Cox Med. Ctrs.*, 27 S.W.3d

812, 819-820 (Mo. Ct. App. 2000).[9]  However, the majority of states to address this issue have allowed expert testimony of personal medical practices, at least for the purpose of impeaching the expert's opinion on the standard of care. Given the prevailing view in other states, Indiana's long-standing rule that a witness' credibility may be attacked by any party, and the essential role of cross-examination in determining the trustworthiness of testimonial evidence, we join the abundant authority from other states and hold that the admission of an expert's testimony about his or her personal practices in medical malpractice cases is permissible for the purpose of impeaching that expert's testimony about the standard of care.  However, we need not address the separate issue of whether an expert's testimony about personal medical practices is relevant to what the standard of care might be since Oaks does not raise that issue for our review.

[26] Here, the trial court agreed that an expert's personal practices are admissible for credibility purposes if the expert's opinion on the standard of care is inconsistent with his personal practices.  Nonetheless, the trial court concluded, and Dr. Chamberlain argues on appeal, that Dr. Moore's personal practices testimony should have been excluded because it would only have shown that

---

[9] The other cases cited by Dr. Chamberlain as support for the exclusion of Dr. Moore's personal practices testimony are inapplicable.  For example, in *Carbonnell v. Bluhm*, 318 N.W.2d 659, 663 (Mich. Ct. App. 1982), the court upheld exclusion of expert testimony as irrelevant because the expert testified *only* on what he would have done and not on what the standard of care was.  Similarly, in *Curran v. Buser*, 711 N.W.2d 562, 570 (Neb. 2006), the court excluded personal practices testimony when it was offered as the only means to establish the standard of care in the first instance, which is not the case here.

Dr. Moore would go "above" the standard of care by taking an x-ray. Dr. Chamberlain maintains that, because that testimony did not conflict with Dr. Moore's testimony about the standard of care but merely showed he would go "above" it, the testimony was correctly excluded as irrelevant.

[27] However, the record contains no evidence that Dr. Moore would have ordered an x-ray simply to go "above" the standard of care. At trial, during the offer of proof, Dr. Moore only testified that he would have obtained an x-ray—he did not give the reason why he would have done so. And, in his deposition, Dr. Moore said he probably would have obtained an x-ray to "confirm what [was] going on" with the patient and, specifically, to "look at the NG placement" and "get an idea" whether the intestines were "backing up" more or less. App. Vol. II at 159. Although, in its ruling, the trial court indicated that it was "represented" to the court "in argument" that Dr. Moore "practices above what he believes the standard of care to be," neither party directs us to any evidence of such a representation. Tr. Vol. IV at 169-70.

[28] Dr. Moore's testimony about his personal practices was in conflict with his testimony on the standard of care. Therefore, his personal practices testimony was relevant and admissible. *E.g.*, *Rallos*, 890 N.E.2d at 1208. Moreover, even if Dr. Moore had testified that he would merely go "above" the standard of care by ordering an x-ray, his personal practices testimony would be relevant and admissible. As the Appellate Court of Illinois stated,

> although an expert who personally exceeds the standard that he testifies to is not as readily impeached as an expert who provides

wholly different treatment than that which he contends is adequate, we cannot deny that such a disparity would, nevertheless, be quite relevant to a jury that is charged with determining which of two highly qualified experts should be believed.

*Schmitz*, 857 N.E.2d at 856-57; *see also Jaynes*, 358 P.3d at 638.  The disparity in Dr. Moore's testimony was relevant for impeachment purposes.

[29]     Still, Dr. Chamberlain argues that, even if the personal practices testimony was relevant, it should have been excluded under Indiana Rule of Evidence 403 because its probative value was substantially outweighed by its potential to cause unfair prejudice and confuse the jury.  Dr. Chamberlain contends that the jury would confuse and conflate Dr. Moore's testimony on the standard of care with his testimony on his personal practices.  That is, he maintains that the personal practices testimony would invite the jury to believe that the evidence was offered to establish the standard of care and not just to impeach Dr. Moore's credibility.

[30]     We cannot agree.  A jury is capable of understanding that the standard of care and a witness' credibility *about* the standard of care are not one and the same but present separate issues, especially when the jury is given clear instructions to that effect.  As the Supreme Court of Georgia has noted,

> any potential confusion created by the admission of such evidence may be remedied through the use of careful jury instructions.  Such instructions should, for example, clearly define the legal meaning of standard of care; enunciate the principle that a mere difference in views between physicians does

not by itself prove malpractice . . . ; and clarify concepts such as burden of proof and credibility of witnesses. In addition, the party whose expert has been cross-examined will have the ability to elicit explanations for why the expert's practices differ from what that expert attested to as the standard of care. Armed with complete information regarding the expert's opinion and personal practices, jurors can make intelligent judgments about the reliability of the expert's testimony.

*Condra*, 681 S.E.2d at 155-56. Similarly, in *Smethers*, 108 P.3d at 955, the Arizona Court of Appeals stated:

[T]he jury is entitled to fully evaluate the credibility of the testifying expert, and the fact that an expert testifies that the standard of care does not require what that expert personally does in a similar situation may be a critical piece of information for the jury's consideration.

We agree with those courts. Therefore, we hold that the trial court abused its discretion in excluding Dr. Moore's testimony about his personal practices.

### Issue Two: Harmless Error

Finally, Dr. Chamberlain asserts that, even if it was error to exclude Dr. Moore's testimony that he would have ordered an x-ray, the error was harmless because it did not "affect the substantial rights of the parties" and it was "cumulative." Appellee's Br. at 60 (citing Ind. Trial Rule 61). Dr. Chamberlain cites *Rodgers v. State,* 422 N.E.2d 1211, 1214 (Ind. 1981), for the proposition that it is harmless error to exclude impeachment evidence that involved a subject that "neither bore directly on an element of the offense or a

matter at issue in the case" because such evidence did not affect Oaks' substantial rights.

[32] Here, we cannot agree. Indiana Trial Rule 61 and Appellate Rule 66 require that we assess the probable impact of an error on the outcome of the case. The probable impact determination can be difficult because, in the final analysis, we do not usually know on appeal what went on in the mind or minds of the trier of fact. However, we face no such difficulty in this case because, here, the standard of care, and whether Dr. Chamberlain followed it, were *the* central questions. As noted above, Dr. Moore's excluded testimony was relevant to whether he was credible when he testified that the standard of care did not require x-rays.[10] And Dr. Moore was Dr. Chamberlain's only witness on the central question of the standard of care. Given the lack of any other evidence that the standard of care did not require x-rays, we conclude that the exclusion of Dr. Moore's personal practices testimony had a probable impact on Oaks' substantial rights.

[33] Nor was the excluded testimony cumulative, as Dr. Chamberlain asserts. Although it is harmless error to exclude testimony that is merely repetitive of

---

[10] Dr. Chamberlain also contends that the exclusion of the testimony was harmless error because Jury Instruction 15 would have required the jury to ignore Dr. Moore's testimony that he would have chosen one of two acceptable treatments (i.e., x-rays and clinical monitoring). However, as already noted, Dr. Chamberlain mischaracterizes Dr. Moore's excluded testimony. Dr. Moore never said that x-rays were one of the acceptable treatments within the standard of care; rather, he specifically said x-rays were *not* required by the standard of care in Oaks' situation but that Dr. Moore would have obtained an x-ray anyway. Jury Instruction 15 would not have required the jury to ignore such relevant testimony.

other evidence, *see, e.g.*, *Spaulding v. Harris*, 914 N.E.2d 820, 830 (Ind. Ct. App. 2009), *trans. denied*, such is not the case here. Dr. Chamberlain asserts that Dr. Moore's testimony that he would have ordered an x-ray is merely cumulative of Oaks' own experts' testimony that the standard of care required serial x-rays. This is a bold argument, and we reject it. First, Dr. Moore did not testify that he would have ordered serial x-rays, only that he "would have gotten *an* x-ray in this situation." Tr. Vol. IV at 168 (emphasis added). Therefore, his testimony would not have been repetitive of Oaks' experts' testimony. Second, the testimony of Oaks' experts on the standard of care does not address the credibility of Dr. Chamberlain's expert. That is, their testimony does not *impeach* Moore but simply conflicts with his opinion of the standard of care. Dr. Moore's testimony, excluded from cross-examination, that he would have done something that he said was not required by the standard of care, on the other hand, speaks directly to his own credibility regarding the standard of care. Accordingly, we hold that the exclusion of the relevant impeachment evidence was not harmless error.

# Conclusion

[34] Oaks did not waive his claim on appeal by failing to object to Jury Instruction 15, as that instruction did not address the issue in this case where a medical expert would have testified upon cross-examination that he personally would have ordered a treatment or procedure above what he had testified was the standard of care. And we hold that that the admission of Dr. Moore's expert testimony about his personal practices is relevant and admissible for the

purpose of impeaching his testimony about the standard of care. Such testimony by Dr. Moore was not more prejudicial than probative, and the trial court abused its discretion in excluding it. Moreover, because Dr. Moore's testimony was the only expert testimony that Dr. Chamberlain had met the standard of care, the exclusion of impeachment evidence from cross-examination was not harmless error. We reverse the jury's verdict and remand for a new trial.

Reversed and remanded with instructions.

Riley, J., and Bradford, J., concur.