## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 09 2020, 8:59 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Dina Cox
Charles R. Whybrew
Lewis Wagner, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Duran L. Keller
Keller Law
Lafayette, Indiana

Zachary T. Williams
Withered Burns & Williams, LLP
Lafayette, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Jeff D. Bieneman and Tonya Bieneman,

*Appellants-Defendants,*

v.

Elliott Foreman, By Next Friend Bobbi Belinda Foreman,

*Appellee-Plaintiff.*

July 9, 2020

Court of Appeals Case No.
19A-CT-2894

Appeal from the Tippecanoe Circuit Court

The Honorable Sean M. Persin, Judge

Trial Court Cause No.
79C01-1705-CT-72

**Najam, Judge.**

# Statement of the Case

Jeff Bieneman ("Jeff") and Tonya Bieneman ("Tonya") (collectively "the Bienemans") appeal a jury verdict in favor of Elliott Foreman ("Elliott"), By Next Friend Bobbi Belinda Foreman ("Belinda") (collectively "the Foremans"), on Elliott's complaint alleging the Bienemans' negligence. The Bienemans present two issues for our review:

1. Whether the trial court abused its discretion when it admitted certain evidence.

2. Whether the jury verdict is excessive.

We affirm.

# Facts and Procedural History

The Bienemans and the Foremans have been next-door neighbors since approximately 2013, and Elliott and the Bienemans' son Ryan are close friends. In 2014 and 2015, the Bienemans owned two Alaskan malamutes, Max and Mia. The Bienemans mostly kept Max on a chain in the yard. Jeff routinely spanked Max, sometimes causing him to "yelp," when he misbehaved. Tr. Vol. 4 at 8. Jeff also routinely hit Max on the nose as a form of discipline. Max was skittish around the Bienemans' vacuum cleaner, and he was scared of a remote-controlled car ("RC car") Ryan played with. Jeff liked to "screw[] with" Max when he was a puppy and "dr[ove] a[n RC] car into" him once. Tr. Vol. 5 at 56-57.

[4] On one occasion in 2014, Max bit Ryan. And in May 2015, as Elliott walked through the Bienemans' yard to look for Ryan, Max bit Elliott. Later that same day, Belinda walked over to the Bienemans' house to leave them a note about the bite, and Max bit Belinda in her breast, breaking the skin. When Belinda later talked to Jeff and Tonya about the bites, Jeff told her that he "should have shot the damn dog when it bit Ryan." Tr. Vol. 3 at 178. The Bienemans assured Belinda that they would take corrective action with Max, such as neutering him, but it was a long time before Belinda allowed Elliott to return to the Bienemans' home to play with Ryan. Unbeknownst to Belinda, Max had already been neutered at the time of the bites in May 2015.

[5] On August 16, 2015, Elliott, then eleven-years-old, was playing with Ryan on the floor inside the Bienemans' home, and Tonya was standing only a few feet away making dinner. Elliott was playing with Legos, and Ryan was playing with an RC car. Max was in the room with the boys, and Ryan drove the car around Max. Tonya knew that Max was "very" scared of the RC car, so she "asked the boys to stop" playing with it. Tr. Vol. 5 at 12. Despite Tonya's request, Ryan continued to play with the RC car. At some point, Elliott heard "a horn honk" and Max attacked Elliott. Tr. Vol. 4 at 137. Max's jaws clamped down on Elliott's head, puncturing his right ear and the top of his head. When Max released Elliott's head, he was bleeding profusely from the wounds, and Tonya applied pressure to Elliott's ear with a washcloth. Tonya then walked Elliott home. Elliott was screaming for his mom along the way, and Belinda came running out of the house.

[6] Belinda loaded Elliott and Ryan into her car, and they drove to a nearby hospital. Elliott was losing so much blood that he wondered whether he might die. At the hospital, a doctor closed the wound on Elliott's head with eight staples and "stitched up" his ear. *Id.* at 143. The doctor then told Belinda that Elliott needed to go to Riley Hospital for Children in Indianapolis to have his ear reattached. At that point, Elliott's stepfather Michael Johnson arrived, and Belinda and Michael drove Elliott to Riley. At Riley, Elliott underwent surgery "to reattach his ear and to clean up the staples." Tr. Vol. 3 at 61. Elliott, Belinda, and Michael spent the night at Riley.

[7] The next day, a doctor asked Belinda whether the dog that bit Elliott was up to date on its rabies shots. Belinda texted Tonya to find out, but got no answer. Elliott spent the next night at Riley, and Belinda and Michael again stayed with him. A doctor followed up about the dog's rabies shots the next day, but Belinda still had not heard anything from the Bienemans.

[8] Once he was released from Riley and returned home, Elliott was in a lot of pain, and he was extremely upset. He did not sleep in his own room, but slept with his mom and stepdad for comfort. Tonya had told Belinda that she would get documentation that Max had been vaccinated against rabies, but she never did. In fact, Max was not current on his rabies shots. Accordingly, Elliott had to go through a series of rabies shots himself, including shots in his head at the site of the dog bite, as well as in his legs, his gluteal muscle, and his arm. Elliott also missed one week of school.

Elliott had previously been in therapy from the age of five to age ten and a half to treat ADHD. And in February 2015, Elliott began therapy with Marianne Spicker because he was having "temper outbursts," trouble in school, and difficulty accepting a new sibling. Tr. Vol. 4 at 71. Elliott saw Spicker six times between February and June 2015. In June 2015, Spicker noted that Elliott had "met all of his goals" and was "looking forward to sixth grade[.]" *Id.* at 81.

After Max bit him in August 2015, Elliott started having trouble in school, he was having nightmares, he was still sleeping with his mom and stepdad, and he threatened suicide. Accordingly, Elliott resumed therapy with Spicker in November 2015. Spicker noted that Elliott was "struggling" and had "[n]ew problems" since she had last seen him, most notably "suicidal thoughts." *Id.* at 75. Elliott told Spicker about Max biting him. He told her that, since the dog bite, he "was really behind in school," he was "hearing voices," and "he was having images in his head of blood and war." *Id.* Elliott told Spicker that he had threatened "to suffocate himself with a pillowcase," and "he was doing things like burping and growling" during a session with Spicker, which is behavior she had not seen in Elliott before. *Id.* at 76. Spicker determined that, because of the dog bite, Elliott "might [have the] criteria for post traumatic stress disorder[ ("PTSD").]" *Id.* Accordingly, Spicker prescribed additional services to treat Elliott, including home case management, school-based case management, and psychiatric care. A doctor prescribed Lexapro for Elliott.

[11] On May 10, 2017, Elliott filed a complaint alleging damages as a result of the Bienemans' negligence.[1] During the ensuing jury trial, Elliott presented evidence over the Bienemans' objections that: Jeff had "smacked the piss" out of Max after he had bit Elliott; and that the Bienemans' other dog Mia had killed the Foremans' chickens. Tr. Vol. 5 at 56. Also at trial, Elliott agreed to not introduce into evidence his medical expenses, past or future. Rather, the trial court instructed the jury, without objection, to consider the following elements of Elliott's damages:

> the nature and extent of the injuries, and the effect of the injuries on Elliott Foreman's ability to function as a whole person; whether the injuries are temporary or permanent; the physical pain and mental suffering experienced and to be experienced in the future as result of the injuries; the disfigurement or scarring resulting from the injuries; and Elliott Foreman's life expectancy.

Tr. Vol. 6 at 4. At the conclusion of trial, the jury entered a verdict in favor of Elliott and assessed fault as follows: 40% fault to Jeff; 35% fault to Tonya; 20% fault to Belinda, a non-party; and 5% fault to Elliott. The jury found that Elliott's damages totaled $1,133,333, which, after allocating fault, meant that Elliott's total recovery was $850,000. The Bienemans filed a motion to correct error, which the trial court denied. This appeal ensued.

---

[1] In the original complaint, Belinda was named as an individual plaintiff, but she was not a named plaintiff by the time of trial. In addition, Elliott's complaint included two counts: negligence and negligent entrustment. The trial court dismissed the negligent entrustment claim on the Bienemans' motion for summary judgment.

## *Issue One: Admission of Evidence*

[12]     The Bienemans first contend that the trial court abused its discretion when it admitted certain evidence at trial. The decision to admit or exclude evidence lies within the sound discretion of the trial court, and we will not disturb the trial court's decision absent a showing of an abuse of that discretion. *Oaks v. Chamberlain*, 76 N.E.3d 941, 946 (Ind. Ct. App. 2017). An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. *Id.*

[13]     The Bienemans assert that the trial court abused its discretion when it admitted evidence that their dog Mia had killed the Foremans' chickens sometime after Max had bitten Elliott. However, while the Bienemans objected to that evidence during Tonya's testimony, they made no objection when Jeff testified that Mia had killed the chickens. It is well settled that a party must object to evidence at the time it is offered in order to preserve the issue for review on appeal. *Everage v. N. Ind. Pub. Serv. Co.*, 825 N.E.2d 941, 948 (Ind. Ct. App. 2005). Moreover, while the Bienemans argue on appeal that this evidence was inadmissible because it was irrelevant to the issues at trial, there is no record that, during Tonya's testimony, they objected based on relevance.[2] It is well-

---

[2] The Bienemans objected to this evidence based on a "lack of personal knowledge." Tr. Vol. 4 at 246. There appears to have been a second objection, but it is depicted in the transcript as "inaudible." *Id.* It is

settled that a mere general objection, or an objection on grounds other than those raised on appeal, is ineffective to preserve an issue for appellate review. *Raess v. Doescher*, 883 N.E.2d 790, 797 (Ind. 2008). The Bienemans have waived this issue for our review.

[14] The Bienemans also assert that the trial court abused its discretion when it admitted evidence that Jeff had "smacked the piss" out of Max after Max bit Elliott in August 2015. Tr. Vol. 5 at 56. The Bienemans objected to this evidence at trial on the ground that it was irrelevant to the issue of negligence. However, they made no argument to the trial court that the evidence was prejudicial, confusing, or misleading. *See* Ind. Evidence Rule 403. Elliott argued to the trial court that this evidence was relevant because Jeff had a history of hitting Max, which, Elliott asserted, "caused this dog to be violent" against Elliott. Tr. Vol. 5 at 53. Elliott argued that Jeff's reaction to the bite was consistent with his mistreatment of Max over the years. The trial court agreed that the evidence showed a "pattern" and admitted the testimony as relevant to the issue of Jeff's negligence. *Id.*

[15] Indiana Evidence Rule 401 provides that evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. On appeal,

---

well settled that "[i]t is the appellant's duty to present an adequate record on appeal, and when the appellant fails to do so, he is deemed to have waived any alleged error based upon the missing material." *Rausch v. Reinhold*, 716 N.E.2d 993, 1002 (Ind. Ct. App. 1999), *trans. denied*.

the Bienemans do not address the trial court's stated reason for admitting the evidence, namely that it was relevant to show a "pattern" of Jeff's abuse of Max. Rather, the Bienemans' argument on appeal on this issue is this:

> The sole issue at trial was whether Tonya breached the duty of care she owed Elliott on August 16, 2015. Tonya was the only adult in the house at the time of the incident, and she was solely responsible for the care and control of Max at the time. Jeff was not present and therefore had no responsibility or ability to control the situation or the dog. Jeff's actions vis-à-vis Max *after* the incident do not logically tend to prove or disprove whether Tonya breached her duty of care owed Elliott at the time of the bite.

Appellants' Br. at 29 (emphasis original).

[16]    The Bienemans have waived this issue for our review. First, they do not direct us to any part of the record to support their assertion that only Tonya could be found liable for the bite. Indeed, the Bienemans agreed to include Jeff as a possible liable party on the verdict form. Second, they cite no case law to support this specious assertion. In fact, it is well settled that *every* dog owner owes a duty of reasonable care to third parties. *Martin v. Hayduk*, 91 N.E.3d 601, 607 (Ind. Ct. App. 2017). Whether Jeff breached that duty was clearly at issue at trial, and the jury found that he did. Third, and moreover, the Bienemans' attorney cross-examined Jeff and brought up Jeff's deposition testimony that he had "hit [Max] with a gun" after Max bit Elliott. Tr. Vol. 5 at 74. The Bienemans have not shown that the trial court abused its discretion

when it admitted evidence that Jeff hit Max after finding out that Max had bitten Elliott.

### Issue Two: Excessive Verdict

[17]    The Bienemans next contend that the jury "speculate[d] and award[ed] damages for non-proven medical expenses" which "makes the jury's verdict excessive under Indiana law." Appellants' Br. at 33. As this Court has explained,

> "[a] jury determination of damages is entitled to great deference when challenged on appeal. *Sears Roebuck and Co. v. Manuilov*, 742 N.E.2d 453, 462 (Ind. 2001). The applicable standard of review has been summarized as follows:
>
>> Damages are particularly a jury determination. Appellate courts will not substitute their idea of a proper damage award for that of the jury. Instead, the court will look only to the evidence and inferences therefrom which support the jury's verdict. We will not deem a verdict to be the result of improper considerations unless it cannot be explained on any other reasonable ground. Thus, if there is any evidence in the record which supports the amount of the award, even if it is variable or conflicting, the award will not be disturbed.
>
> *Id.* (quoting *Prange v. Martin*, 629 N.E.2d 915, 922 (Ind. Ct. App. 1994) (internal citations omitted)[, *trans. denied* ]). In addition, [our] Supreme Court has noted the following:
>
>> Our inability to actually look into the minds of the jurors is, to a large extent, the reason behind the rule that we will not reverse if the award falls within the

bounds of the evidence.  We cannot invade the
province of the jury to decide the facts and cannot
reverse unless the verdict is clearly erroneous.

*Id.* (quoting *Annee v. State*, 256 Ind. 686, 690, 271 N.E.2d 711,
713 (1971)).”

*Spaulding v. Cook*, 89 N.E.3d 413, 420-21 (Ind. Ct. App. 2017) (quoting *Flores v.
Gutierrez*, 951 N.E.2d 632, 636 (Ind. Ct. App. 2011) (emphasis added), *trans.
denied*), *trans. denied*.

[18]     As the Bienemans point out, Elliott did not present evidence of his medical
expenses, past or future, at trial.  Without any objection, the trial court
instructed the jury to award damages to Elliott based on:

the nature and extent of the injuries, and the effect of the injuries
on Elliott Foreman's ability to function as a whole person;
whether the injuries are temporary or permanent; *the physical pain
and mental suffering experienced and to be experienced in the future* as
result of the injuries; the disfigurement or scarring resulting from
the injuries; *and Elliott Foreman's life expectancy*.

Tr. Vol. 6 at 4 (emphases added).

[19]     On appeal, the Bienemans maintain that “Elliott's counsel asked questions of
Elliott and Belinda indicative of a request of future medical expenses” and
“made statements during closing argument indicative of a claim for the
recovery of medical expenses.”  Appellants' Br. at 33.  However, the Bienemans
do not direct us to *any part of the record* to support their assertions either with
respect to Elliott's counsel's questions of Elliott and his mom or during closing

argument. The Bienemans' only support for their contentions on this issue consists of: (1) the trial court's comments *during a side bar* that jurors would be "wondering" about Elliott's medical expenses and (2) two jury questions, only one of which requested an itemization of Elliott's medical expenses. Tr. Vol. 2 at 234. Clearly, the court's comments during a side bar had no impact on the jury, and the Bienemans do not direct us to anything in the record showing that the court answered either of the two jury questions.

[20] In sum, the Bienemans' contention that the jury award is excessive because it is based on medical expenses is pure speculation. There is simply no evidence in the record to support a determination on appeal that, rather than assess Elliott's damages based on the elements provided in the jury instructions, the jury considered anything improper in awarding Elliott damages. Elliott presented evidence that he sustained serious physical and emotional injuries, including scars and disfigurement, as a result of the dog bite. The jury was instructed to consider Elliott's young age and the permanence of his injuries in assessing his damages. The Bienemans have not shown that the verdict is clearly erroneous.

[21] Affirmed.

Kirsch, J., and Brown, J., concur.